IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNZOIL-QUAKER STATE CO., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05-1505 |
| | ) | |
| v. | ) | Judge David Stewart Cercone |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| KEITH R. SMITH d/b/a LUBE PRO, | ) | |
| | ) | Doc. Nos. 38, 42 |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

## I.  RECOMMENDATION

It is respectfully recommended that Plaintiff's Supplemental Motion for Summary Judgment (Doc. No. 42) be granted as to Count I (Federal Trademark Infringement), Count III (Federal Unfair Competition), Count V (Common Law Trademark Infringement and Unfair Competition), and Count VII (False Advertising), and denied as to Count II (Trademark Counterfeiting), Count IV (Federal Trademark Dilution), Count VI (Pennsylvania Trademark Dilution), and Count VIII (Unjust Enrichment).  It is further recommended that Defendant's Motion for Summary Judgment (Doc. No. 38) be granted as to Counts II, IV, VI and VIII, and denied as to Counts I, III, V, and VII.  It is further recommended that summary judgment be entered in Plaintiff's favor as to all of the affirmative defenses raised by Defendant in his Memorandum of Fact and Law in Support of Defendant's Motion for Summary Judgment (Doc. 39).  It is further recommended that Plaintiff's request for a permanent injunction and an award of reasonable attorneys' fees and costs be granted, but Plaintiff's request for statutory damages be denied.

## II.  **REPORT**

This case involves claims for trademark infringement, counterfeiting, dilution, unfair competition,  false advertising, and unjust enrichment under the Trademark Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.* ("Lanham Act"), and Pennsylvania state law.  Specifically, Plaintiff, Pennzoil-Quaker State Company ("PQS") asserts that Defendant, Keith R. Smith, d/b/a Lube Pro ("Smith" or "Defendant"), displayed signs belonging to and containing the registered trademark of PQS,  in prominent locations on Defendant's business premises without PQS's permission, to advertise that PQS's products were featured in Defendant's oil-changing business, while in fact, 3% or less of the oil used at Defendant's facility is genuine Pennzoil brand motor oil. PQS contends that despite repeated requests to remove the signs, Defendant has failed to do so and, consequently, his actions have caused confusion among consumers and others regarding the source, sponsorship, and/or affiliation of Defendant's services.

This Court has original subject matter jurisdiction over Plaintiff's Lanham Act claims pursuant to 28 U.S.C. §§1331 and 1338, and 15 U.S.C. § 1121(a), and has supplemental jurisdiction over the state law claims under 28 U.S.C.  § 1367(a).  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) since the alleged infringement occurred in this District.

Both parties have moved for summary judgment.  PQS requests summary judgment in its favor on three of its claims–trademark infringement (Count I); trademark counterfeiting (Count II), and false advertising (Count VII).[1]  In support of its motion, PQS submits that it has conclusively

---

1.  Plaintiff initially moved for summary judgment on only three claims in order to simplify the analysis and because its other claims provide no relief not already provided by these three claims.  However, in Plaintiff's Memorandum in Opposition to Defendant's Cross-Motion for Summary Judgment (Doc. No. 47) ("Pl.'s Mem. in Opp'n"), Plaintiff argues that summary judgment in its favor is appropriate on its remaining claims as well, since Smith has cross-moved

established all of the elements of each of its claims, and no genuine issues of fact exist for trial. Therefore, PQS maintains that it is entitled to judgment in its favor as a matter of law. Smith has cross-moved for summary judgment on all claims and defenses, arguing that PQS has failed to produced any evidence of counterfeiting, dilution, unfair competition, false advertisements, or unjust enrichment, nor has PQS offered or produced any evidence which establishes or tends to establish that: (1) any of the signs at issue were "spurious counterfeit marks"; (2) Smith's conduct was malicious, fraudulent, deliberate, willful, intentional, and in bad faith with full knowledge and conscious disregard of PQS's rights; and (3) Smith engaged in a deliberate course of conduct to deceive consumers. Smith further argues that PQS is guilty of laches in not removing the signs at issue and for not taking immediate legal action, and such inaction, as well as PQS's acquiescence, encouragement, and/or abandonment of the signs, have created and/or contributed to the confusion or likelihood of confusion, if any. Therefore, Smith submits that he is entitled to judgment in his favor as a matter of law.[2]

### A. **Statement of Relevant Facts and Procedural History**

The following relevant facts are not disputed. PQS owns the trademark PENNZOIL and owns valid, subsisting, and incontestable federal trademark registrations for the PENNZOIL marks listed in paragraph 12 of its Complaint, which bear registration dates ranging from 1961 to 1998.

---

for summary judgment on all claims and defenses. (Pl.'s Mem. in Opp'n at 22-23.) Plaintiff's remaining claims include federal unfair competition (Count III), federal trademark dilution (Count IV), common law trademark infringement and unfair competition (Count V), trademark dilution under Pennsylvania law (Count VI), and unjust enrichment (Count VIII). (Compl. ¶¶ 39-47, 50-51.)

2. In his cross-motion for summary judgment, Smith contends that the material issues of fact are not disputed. However, in responding to Plaintiff's motion for summary judgment, Smith argues that material facts are in dispute. He cannot have it both ways.

Since at least 1915, PQS and its authorized distributors and dealers have used the PENNZOIL mark and PENNZOIL logo, which incorporate a Liberty Bell design, in connection with the sale and promotion of lubricants and other petroleum products. PQS's authorized oil-change facilities use its marks to indicate that the facilities feature PENNZOIL products. PQS has expended great resources promoting its PENNZOIL marks throughout the United States and Pennsylvania. (Pl.'s Stmt. of Undisputed Facts (Doc. 44) ("SUF"), ¶¶ 1-5; Def.'s Mem. of Fact & Law in Supp. of Mot. for Summ. J. (Doc. 39) ("Def.'s Mem."), Section 6, Part F, ¶¶ 1-5.) Smith recognizes the PENNZOIL name and bell logo as the trademark of Pennzoil. (Smith Dep. at 31, Tab A in Pl.'s App.)[3]

In May of 2004, Smith purchased the Lube Pro facility located at 635 Route 228 in Mars, Pennsylvania, from Thomas Napierkowski for $25,000.00. (Pl.'s SUF, ¶¶ 6-7; Def.'s Mem., § 6, Part F, ¶¶ 6-7.) The Agreement between Napierkowski and Smith dated May 4, 2004 ("Agreement of Sale"), provided that possession and use of the business premises and equipment would be transferred upon receipt in full of the agreed sale price, and any debt incurred by and for the business prior to the date of the Agreement of Sale are the responsibility of the seller. (Ex. 43 in Def.'s App.)[4] Smith did not investigate whether Mr. Napierkowski had any bona fide ownership interest in the assets he was selling. (Pl.'s SUF, ¶ 8; Def.'s Mem., § 6, Part F, ¶ 8.)

---

3. Although in his Answer to paragraph 8 of the Complaint Defendant has denied that the PENNZOIL mark is well known, his admissions to Plaintiff's Statement of Undisputed Facts (¶¶ 1-5) and his deposition testimony belie that denial. Moreover, Smith's bare denial in the face of uncontroverted evidence to the contrary does not create a material issue of fact.

4. While both parties refer to Thomas Napierkowski as the selling party, the Agreement indicates that the seller is Nadine Napierkowski. The Court need not resolve this discrepancy as it is not relevant to the disposition of the cross-motions for summary judgment.

At his Lube Pro facility, Smith displays exterior and interior signage prominently bearing the PENNZOIL marks. (Pl.'s SUF, ¶ 10; Def.'s Mem., § 6, Part F, ¶ 10; *see also* Ex. 1, 5, 5A, 6, 7, 20, 26, 35-39 in Def.'s App.) In particular, Smith prominently displayed a road-side sign stating "We Feature PENNZOIL products" immediately beside the words "Lube Pro" at his Lube Pro facility.[5] (Pl.'s SUF, ¶ 11.) This road-side sign was located along a main thoroughfare in the Mars, Pennsylvania area, and its purpose was to draw people into the oil-change facility. (Pl.'s SUF, ¶¶ 13-14; Def.'s Mem., § 6, Part F, ¶¶ 13-14.) This road-side sign was removed sometime after December 2005.[6] (Def.'s Dep. at 108-112.) Smith also displays a large PENNZOIL sign on the front, right-hand side, of the exterior of his facility. (Pl.'s App., Tabs C&D; Def.'s App. Ex. 5.) On the interior his facility, Smith displays a PENNZOIL sticker on a cabinet inside the Lube-Pro work bay. (Pl.'s SUF, ¶ 17; Def.'s Mem., § 6, Part F, ¶ 17; Def.'s App., Ex 5A.) Additionally, Smith displays interior and exterior signage bearing the marks of other oil product manufacturers whose oil products he uses in his oil change business. (Def.'s Mem., § 6, Part F, ¶¶ 10-11; *see also* Ex. 1, 5A, 7-12, 20, 26, 31-32 in Def.'s App.)[7]

Smith did not display any signs along the roadway as large or prominent as the PENNZOIL sign. (Pl.'s SUF, ¶ 43; Def.'s Mem., § 6, Part F, ¶ 43.) Although Smith stated at his deposition that he does not advertise that he "features" any brand of motor oil other than PENNZOIL (Smith Dep.

---

5. This road-side sign is depicted in the photograph identified as Exhibit 3 of Smith's Deposition. (Tab B in Pl.'s App.; *see also* Ex. 1 in Def.'s App.)

6. Defendant submits that the "We Feature PENNZOIL Products" sign was removed within a couple weeks after he purchased the new sign in December of 2005. Plaintiff disputes that the sign was removed at that time. For purposes of the pending motions, the actual date of removal is not critical to the Court's ruling.

7. The other oil products include Valvoline, Mobil, Rotella T, and Castrol.

at 145), he forgot that he also displays a sign at his oil-change business which states "We feature Valvoline Products" (Def.'s Mem., § 6, Part F, ¶ 44).

The PENNZOIL signage displayed at Smith's Lube Pro facility was obtained by a previous owner of the facility, Mr. Howard, doing business as Howard's Express Lube.[8] (Pl.'s SUF, ¶ 12: Def.'s Mem., § 6, Part F , ¶ 12.) In August of 1995, Mr. Howard executed a Pennzoil Sign Addendum, which provides in relevant part:

> **2.01 Loan of Sign Panels to Operator.** Within 30 days after the date of this Addendum . . . Pennzoil shall loan and cause to be delivered to Operator Sign Panels to be installed at Operator's Center. . . . Pennzoil loans the Sign Panels to Operator at no charge.
>
> . . .
>
> **2.03 Sign Panels Property of Pennzoil.** Operator acknowledges and agrees that the Sign Panels shall at all times remain the sole property of Pennzoil. In the event Operator discontinues featuring Pennzoil brand motor oil and lubricants at Operator's Center, Operator agrees and grants to Pennzoil the right to enter upon Operator's property and to remove the Sign Panels at any time. Operator agrees to reimburse Pennzoil, upon demand by Pennzoil, for all costs incurred by Pennzoil in connection with the removal of the Sign Panels from Operator's Center . . ..

Pennzoil Sign Addendum, ¶¶ 2.01, 2.03 (Ex. 4 in Def.'s App.). Smith testified he was unaware of this Addendum until Plaintiff's counsel showed it to him at his deposition on October 9, 2006. (Smith Dep. at 48-49.)

Mr. Howard eventually sold his business to Mr. Napierkowski. Upon learning that Mr. Napierkowski, doing business as Lube Pro, was selling bulk lubricants in association with Plaintiff's registered trademark PENNZOIL as an unauthorized PQS jobber, counsel for PQS wrote to Mr.

---

8. It appears that Howard's Express Lube was operated as a Pennzoil franchise during Mr. Howard's ownership. (Smith Aff. ¶ 3; Ex. 4 in Def.'s App.)

Napierkowski on February 25, 2004, requesting that he immediately discontinue all sales of bulk lubricants in association with the PENNZOIL trademark and remove the Pennzoil commercial sign from his business premises.[9]  (Tab H in Pl.'s App.)  After receiving no response from Mr. Napierkowski, on April 30, 2004, less than one week prior to Napierkowski's sale of Lube Pro to Smith, counsel for PQS sent another cease and desist letter to Mr. Napierkowski via certified mail. (*Id*; Pl.'s SUF, ¶ 28; Def.'s Resp. to Pl.'s SUF, ¶ 28.)  According to Smith, Mr. Napierkowski never informed him of the cease and desist letters from PQS.  (Pl.'s SUF, ¶ 28; Def.'s Resp. thereto, ¶ 28; *see also* Smith Dep. at 107.)

After Smith acquired ownership of Lube Pro, Plaintiff's representatives called on  Smith on several occasions to request that he sign a contract to be an authorized distributor of Pennzoil products.  (Smith Dep. at 58-59.)  Smith declined these offers because, in his opinion, PQS charged too much for the bulk oil and he could not make a profit at that rate.  (*Id*.)  Apparently, after several unsuccessful attempts to sign up Smith as its authorized distributor, PQS requested in writing on October 14, 2004 that he "immediately discontinue all sales of bulk lubricants in association with the – PENNZOIL® – trademark and . . . remove the Pennzoil logo sign from [his] business premises."  (Ex. 10 to Smith Dep., Tab J in Pl.'s App.)  In that correspondence, counsel for PQS specifically referred to the commercial sign displaying the PQS trademark logo located at the front of the building in which Smith's Lube Pro business is located.[10]  (*Id*.)  Although he understood from

---

9.  PQS sent the February 25, 2004 correspondence via certified mail, return receipt requested. Correspondence dated April 30, 2004 from counsel for PQS to Napierkowski indicates that a return receipt verified delivery of the February 25th correspondence to Napierkowski on February 27, 2004. (Tab H in Pl.'s App.)

10.  This sign is the road-side sign that stated "We Feature PENNZOIL Products" identified as Exhibit 3 to Smith's deposition.  (Tab B in Pl.'s App.)

the October 14th letter that PQS wanted him to take down the sign, Smith refused to take down the sign, believing that the October 14th letter was merely a ploy by PQS to get him to sign a distributor contract. (Smith Dep. at 60.) Smith believed that he owned the sign in question based on the following language in the Agreement of Sale with Napierkowski: "Possession and use of the above said business premises and equipment shall be transferred upon receipt in full of the agreed sale price." (Smith Dep. at 31 (quoting Agreement of Sale, Ex. 43 in Def.'s App.).) Smith did not take any action in response to the October 14th letter, such as consult an attorney, respond to PQS, or remove the sign in question. (Pl.'s SUF, ¶ 31; Def.'s Mem., § 6, Part F, ¶ 31.)[11]

On December 13, 2004, PQS sent Smith another letter demanding the removal of the PENNZOIL sign from the Lube Pro facility and the discontinuance of sales of bulk lubricants in association with the PENNZOIL trademark. (Pl.'s App., Tab K.)

On March 16, 2005, counsel for PQS sent Smith a letter to follow-up a conversation that occurred between Smith and PQS's agent, Roger Krivosky, during which it is alleged that Mr. Krivosky requested that Smith remove the "4 x 4 panels on the sign at [his] premises which display the "Pennzoil" trademark." (March 16, 2005 Correspondence from Kimbley L. Muller (Pl.'s App., Tab I).) In the March 16th correspondence, counsel informed Smith that the PENNZOIL sign at issue was loaned to a predecessor-in-interest of his oil-change business and title was never transferred to Smith or any of his predecessors. (*Id.*) PQS also informed Smith that the March 16th letter was a last request to remove the "featured by" 4 x 4 Pennzoil signs from his premises prior to

---

11. Smith does not deny this statement, other than to argue that the letter came from Shell, not Pennzoil. This is a distinction without a difference. Although the stationary has "Shell Oil" in the heading, the writer clearly indicates in the first sentence of the October 14th correspondence that she is representing "Pennzoil-Quaker State Company" in trademark matters. (Pl.'s App., Tab J.)

commencing legal action against him. (*Id.*) Additionally, PQS informed Smith of its belief that he was violating the Lanham Act and Pennsylvania laws by creating consumer confusion in the marketplace by displaying signs indicating that the Lube Pro facility features Pennzoil products when in fact he did not even have Pennzoil products available for his consumers. (*Id.*) Finally, counsel for PQS informed Smith of the Plaintiff's willingness to remove the sign at its own expense to resolve the matter and requested that Smith grant its independent contractor permission to enter his premises for that limited purpose. (*Id.*) Smith testified at his deposition that he did not recall reading the March 16, 2005 letter, but stated that even if he had, he would not have returned the sign to PQS. (Pl.'s SUF, ¶ 27; Def.'s Mem., § 6, Part F, ¶ 27; Smith Dep. at 54.)

Smith admits that he is not an authorized distributor of PENNZOIL products, and that he did not obtain Plaintiff's consent prior to using PQS's signage. (Pl.'s SUF, ¶¶ 24-25; Def.'s Mem., § 6, Part F, ¶¶ 24-25.) However, Smith maintains that because he bought the sign from Napierkowski, he owned it and therefore he did not need the permission or consent of PQS to use the PENNZOIL signage. (Def.'s Mem., § 6, Part F, ¶ 25.) Moreover, Smith does not deny that he continued to willfully use the PENNZOIL mark and PENNZOIL signage after PQS demanded that stop, but rather, reiterates his position that he owned the signage and therefore was not required to stop using it. (Pl.'s SUF, ¶ 33; Def.'s Mem., § 6, Part F, ¶ 33; Smith Dep. at 143-44.)

More than 95% of all the oil used by Smith in his oil change business comes from bulk containers. (Pl.'s SUF, ¶ 34; Def.'s Mem., § 6, Part F, ¶ 34.) Since purchasing Lube Pro in 2004, Smith has never made a bulk purchase of PENNZOIL motor oil, because he believes it is too expensive. (*Id.* at ¶ 35.) Nor has Smith ever purchased PENNZOIL motor oil from the local distributor of PENNZOIL motor oil in the Mars, Pennsylvania area, Purvis Brothers. (*Id.* at ¶¶ 36-

37.)  In 2005, Smith used approximately 5,000 gallons of oil in connection with his oil-change

services, and approximately 100 to 150 gallons of which were PENNZOIL, which was purchased

in pre-packaged, one-quart containers for less than $ 1,000.00 in the aggregate, usually from Costco,

Walmart, or similar type stores.  (*Id.* at ¶¶ 38-39; *see also* Smith Dep. at 41, 64; Smith Aff. ¶ 19.)

The primary brands of motor oil used by Smith in 2005 were AGIP and Ultra Lube.  (Pl's SUF, ¶

40; Def.'s Mem., § 6, Part F, ¶ 40.)

Smith only used PENNZOIL brand products in his oil change business if specifically

requested by the customer.  (*Id.* at ¶ 45.)  Smith estimated that customers specifically requested that

he use PENNZOIL brand products less than once a week, and possibly as little as once a month.  (*Id.*

at ¶ 46.)  In addition, less than one percent of Smith's customers request a specific brand of motor

oil.  (*Id.* at ¶ 47.)  At the time of his deposition, Smith was charging fleet customers $ 29.95 per oil

change; in 2005 he charged $ 26.95 for fleet customers.  (*Id.* at ¶ 48-49.)

PQS instituted the present action on October 28, 2005.  Discovery is now complete and both

sides have moved for summary judgment.  The motions have been fully briefed and are ripe for

disposition.

### B.    Summary Judgment Standard

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party,

"the pleadings, depositions, answers to interrogatories and admissions on file, together with the

affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Summary judgment may be granted against

a party who fails to adduce facts sufficient to establish the existence of any element essential to that

party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When the parties have filed cross-motions for summary judgment, as in this case, the summary judgment standard remains the same. *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F.Supp.2d 425, 430 (M.D.Pa. 2006). "When confronted with cross-motions for summary judgment, . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (quoting *Marciniak v. Prudential Fin. Ins. Co. of Am.,* No. 05-4456, 184 Fed. Appx. 266, 270 (3d Cir. June 21, 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." *Id.* (citing *Iberia Foods Corp. v. Romeo,* 150 F.3d 298, 302 (3d Cir. 1998)).

## C.  **Analysis**

At issue in this case are three Pennzoil signs displayed at Smith's Lube Pro facility: (1) the large road-side "We Feature Pennzoil Products" sign (removed sometime after December 2005); (2) the large Pennzoil sign attached to the front right-hand side of Smith's facility; and (3) a Pennzoil

logo sign at the bay entrance.  PQS submits that the number, prominence, and plain language of the Pennzoil signs displayed by Smith lead customers to the conclusion that he uses Pennzoil motor oil when customers request an oil-change and that Smith's oil change business is affiliated with PQS. However, only 2 to 3 percent of the motor oil used by Smith is genuine Pennzoil brand oil, as Smith primarily uses AGIP and Ultralube brand oils which are less expensive.  Moreover, Smith is not affilitated with PQS nor is he authorized to use the Pennzoil marks in his oil change business.  Thus, PQS contends that by baiting customers into the Lube Pro facility with the trusted Pennzoil marks and then using a less expensive off-brand motor oil instead, Smith has obtained the benefit of the Pennzoil marks, without following any of the quality control provisions required by PQS or undertaking the purchase commitments required of authorized Pennzoil oil-change facilities which, according to PQS, are utilized to deter precisely this type of bait-and-switch conduct.  (Pl.'s Mem. of Law in Supp. of Supplemental Mot. for Summ. J. (Doc. 43) at 3-4.)

Smith responds, essentially, that he owns the Pennzoil signs by virtue of the Agreement of Sale between Napierkowski and himself, and he did not engage in any so-called "bait and switch" tactics.

### 1.      Plaintiff's Motion for Summary Judgment

Initially, Plaintiff has moved for summary judgment on its trademark infringement claim (Count I), trademark counterfeiting (Count II), and false advertising (Count VII).  Subsequently, in response to Defendant's motion for summary judgment on all claims, Plaintiff also requests summary judgment on its remaining claims of federal unfair competition (Count III), federal trademark dilution (Count IV), common law trademark infringement and unfair competition (Count V), and trademark dilution under Pennsylvania law (Count VI).  Each of these claims is addressed

below.

   *a.*  **Federal Trademark Infringement (Count I), Federal Unfair Competition (Count III), & Common Law Trademark Infringement and Unfair Competition (Count V)**

   Under the Lanham Act, trademark infringement is defined as "'use of a mark so similar to that of a prior user as to be 'likely to cause confusion, or to cause mistake, or to deceive.'" *Freedom Card, Inc. v. JPMorgan Chase & Co.,* 432 F.3d 463, 469 (3d Cir. 2005) (quoting *Kos Pharmaceuticals, Inc. v. Andrx Corp.,* 369 F.3d 700, 711 (3d Cir. 2004) (quoting 15 U.S.C. § 1114(1))).  In other words, "'[t]he law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion.'" *Id.* (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir. 1994)).  Therefore, to establish a claim for trademark infringement under the Lanham Act, a plaintiff must prove that: "'(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark is likely to create confusion concerning the origin of the goods or services.'" *Id.* at 470 (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 202 (3d Cir. 1999) (en banc)) (footnote omitted).  This standard also applies to Plaintiff's federal unfair competition claim under 15 U.S.C. § 1125(a)(1)(A).  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 & n. 5 (3d Cir. 2000) (citation omitted).  The burden of proving these claims rests with the plaintiff.[12]  *Id.* at 210-11; *Freedom Card,* 432 F.3d at 470 n.14 (citation omitted).  Here it

---

12.  Thus, the Court's analysis and conclusion regarding Plaintiff's federal trademark infringement claim applies equally to Plaintiff's federal unfair competition claim.  In addition, the Court need not address separately Plaintiff's Pennsylvania common law claims of trademark infringement and unfair competition.  The elements of common law trademark infringement under Pennsylvania law are identical to elements of federal trademark infringement under the Lanham Act, except for the element of interstate commerce required in the latter.  *Standard Terry Mills, Inc. v. Shen Mfg. Co.,* 803 F.2d 778, 780 n. 4 (3d Cir. 1986) (citations omitted).

is undisputed that PQS owns the Pennzoil mark, a valid and legally protectable mark. Therefore, the only issue for this Court to resolve is whether PQS has established Smith's use of the Pennzoil signs is likely to create confusion concerning the origin of the motor oil used in his oil change business.[13]

"'A likelihood of confusion exists when consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Freedom Card,* 432 F.3d at 470 (quoting *A & H Sportswear,* 237 F.3d at 211). In evaluating this factor, the relevant inquiry is whether consumer confusion is likely, not whether it is possible. *Id.* (citing *A & H Sportswear,* 166 F.3d at 198). In the case of direct confusion, which is at issue here, the Court of Appeals has adopted a ten-factor, non-exhaustive test in determining whether similar marks create a likelihood of confusion, which is commonly referred to as the "*Lapp* factors." *Id.* The ten "*Lapp* factors" consist of the following:

> (1)    the degree of similarity between the owner's mark and the alleged infringing mark;
> (2)    the strength of the owner's mark;
> (3)    the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4)    the length of time the defendant has used the mark without

---

Likewise, Pennsylvania law and the Lanham Act are identical with regard to unfair competition, except for the federal requirement of interstate commerce. *Artus Corp. v. Nordic C o., Inc.,* 512 F.Supp. 1184, 1187 (W.D.Pa. 1981). Therefore, the Court's analysis and holding as to the federal trademark infringement and unfair competition claims applies equally to Plaintiff's claims of common law trademark infringement and unfair competition under Pennsylvania law.

13. Plaintiff submits that Smith has admitted the essential elements of Plaintiff's trademark infringement claim. Smith disputes this statement. From a review of the briefs and concise statements of undisputed facts and responses thereto, it appears that Smith does concede the first two elements of Plaintiff's trademark infringement claim, but disputes the third element–the likelihood of confusion.

> evidence of actual confusion arising;
>
> (5)    the intent of the defendant in adopting the mark;
>
> (6)    the evidence of actual confusion;
>
> (7)    whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;
>
> (8)    the extent to which the targets of the parties' sales efforts are the same;
>
> (9)    the relationship of the goods in the minds of consumers because of the similarity of function;
>
> (10)    other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Id.* at 471 (quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir.1983) (citation omitted).

As the Court of Appeals noted in *Lapp,* "[w]here the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself. In those cases the court will generally examine the registered mark, determine whether it is inherently distinctive or has acquired sufficient secondary meaning to make it distinctive, and compare it against the challenged mark. . . . Once a trademark owner demonstrates likelihood of confusion, it is entitled to injunctive relief." 721 F.2d at 462 (citing 15 U.S.C. § 1114(1) (1976)).

In analyzing the *Lapp* factors, the Court may accord different factors different weights, based on the particular factual circumstances, but should employ the factors that are appropriate to a given situation. *Freedom Card,* 432 F.3d at 471 (citing *A & H Sportswear,* 237 F.3d at 215). Indeed, given the qualitative nature of the inquiry, some factors may not be relevant in a particular case.[14] *Id.* (citing *A & H Sportswear,* 237 F.3d at 215).

---

14. In that instance, the trial court should explain its basis for not utilizing certain factors in order to facilitate appellate review. *Id.* at 471 n. 16 (citing *A & H Sportswear,* 237 F.3d at 215 n. 8.)

With these precepts in mind, the Court turns now to an analysis of the likelihood of confusion element, which requires application of the *Lapp* factors to the evidence in this case.

### (1) Degree of Similarity between the Conflicting Marks

Plaintiff submits that this factor militates in favor of finding that confusion is likely, as the marks in question are identical. In response, Smith argues that "semantically, [there is] no 'degree of similarity' as in the case where a defendant's counterfeit was similar to a plaintiff's original." Smith further responded that the marks in question were loaned, abandoned, given or sold by Plaintiff to Lube Pro. The Court finds the evidence shows that the marks in question are identical, and Smith concedes as much. "The single most important factor in determining likelihood of confusion is mark similarity." *A&H Sportswear,* 237 F.3d at 216 (citing *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 476 (3d Cir. 1994)). Such similarity is determined by asking whether the marks create the same overall impression when viewed separately. *Id.* "Marks 'are confusingly similar if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship.'" *Id.* (citing *Fisons Horticulture, supra*). Because it is uncontested here that the marks are identical, the Court agrees with Plaintiff that this factor militates strongly in favor of likelihood of confusion.

### (2) Strength of the Owner's Mark

Plaintiff submits that this factor also militates in favor of finding a likelihood of confusion. In support of this position, Plaintiff argues that it has used its PENNZOIL mark since 1915 and has invested heavily in its development and promotion, and that Defendant has conceded this point. Defendant has not proffered any response to Plaintiff's argument on this *Lapp* factor.

Ordinarily, in measuring the strength of the owner's mark, the Court must evaluate two

factors: "(1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition)." *Freedom Card,* 432 F.3d at 472 (citing *A&H Sportswear,* 237 F.3d at 221). Plaintiff has proffered Defendant's admissions to its Statement of Undisputed Facts and his admissions in his Answer to the complaint to demonstrate the commercial strength of the PENNZOIL marks. (Pl.'s SUF, ¶¶ 1-5; Def.'s Mem., Section 6, Part F, ¶¶ 1-5; Def.'s Answer to Compl., ¶¶ 7, 11.) While lacking in detail, Plaintiff's *uncontested* statements indicate generally that Plaintiff has expended great resources over the years to promote and advertise its PENNZOIL mark extensively throughout the United States and Pennsylvania, and has used the PENNZOIL mark and logo since at least 1915 in connection with the sale and promotion of lubricants and other petroleum products. In light of the fact that these statements are uncontested, the Court concludes that the commercial strength of the PENNZOIL mark is great within the lubricant/petroleum products market.

As to the conceptual strength of the mark, usually the Court must determine in which of the following four categories, ranging from strongest to weakest, to place a given mark: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; or (4) generic. *Freedom Card,* 432 F.3d at 472 (citing *A&H Sportswear,* 237 F.3d at 221). Generic marks do not receive any protection as they are not considered trademarks. *A&H Sportswear,* 237 F.3d at 222 (citation omitted). Moreover, a mark which is merely descriptive of an applicant's goods or services cannot be registered unless the applicant shows that the mark has secondary meaning.[15] *Park 'N Fly, Inc. v. Dollar Park and Fly,*

---

15. "'To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.'" *Blockbuster Entm't Group v. LAYLCO, Inc.,* 869 F.Supp. 505, 510 (E.D. Mich. 1994) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11 (1982)). Common indicators of secondary meaning include: "(1) advertising expenditures;

*Inc.,* 469 U.S. 189, 196 (1985). However, a descriptive mark that has acquired a strong secondary meaning may be considered strong. *Blockbuster Entm't Group*, 869 F.Supp. at 510.

The primary purpose in assigning a level of distinctiveness to a given mark is to ascertain whether the mark is protectable as a trademark in the first instance. *A&H Sportswear,* 237 F.3d at 222 (citing *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir. 1986) (other citations omitted)). Once protectability has been demonstrated, the classification of a mark as arbitrary, suggestive or descriptive is secondarily used to ascertain the degree of protection a mark should receive. *Id.* Although this classification system is useful in determining conceptual strength, it is not dispositive. *Id.* (citations omitted).

Thus, the distinctiveness element appears to have more relevance where the trademark is not registered, or where there is a question as to the validity of the registration. *See, e.g., A.J. Canfield Co.,* 808 F.2d at 296 (an unregistered trademark is entitled to protection under section 43(a) of the Lanham Act but only where the designated trademark achieves a certain level of inherent distinctiveness, *i.e.*, something other than "generic"); *A&H Sportswear,* 237 F.3d at 221 (in determining whether a mark is protectable as a trademark, court must classify the mark in one of four categories ranging from strongest to weakest). Neither situation is present here. Rather, Plaintiff has produced federal registration certificates for all of its PENNZOIL marks, and Defendant has admitted to their validity and incontestability.[16] (Compl. ¶ 12; Answer ¶ 12.) It is well settled

_____

(2) consumer studies linking the name to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Id.* (citations omitted).

16. "A registered trademark becomes incontestable after the owner files an affidavit stating that it has been in continuous use in commerce for five consecutive years subsequent to registration, that it is still in use, and there are no pending proceedings and no adverse decision concerning

that once a trademark is federally registered and has achieved incontestability, its validity and legal

protectability are established. *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 291

(3d Cir. 1991) (en banc) (citing *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d

187, 194 (3d Cir. 1990)).

Assuming then that Plaintiff's marks are incontestable, they are conclusively presumed to

be either nondescriptive or to have acquired secondary meaning. *Beer Nuts, Inc. v. Clover Club*

*Foods Co.,* 805 F.2d 920, 924 (10th Cir. 1986) (citing *Park 'N Fly, supra*; *Soweco, Inc. v. Shell Oil*

*Co.,* 617 F.2d 1178, 1184-85 (5th Cir. 1980) (other citation omitted)). As such, Plaintiff's marks are

entitled to strong protection, but just how strong is not ascertainable on this summary judgment

record. Plaintiff has not set forth any facts or argument as to the level of distinctiveness of its marks,

and Defendant has failed to respond altogether to Plaintiff's position on the second *Lapp* factor.

Nonetheless, it appears that Plaintiff's marks cannot be classified as either generic, or arbitrary or

fanciful, since Plaintiff's mark does not constitute a common description of goods, nor does it use

terms that "'bear no logical or suggestive relation to the actual characteristics of the goods.'" *A&H*

*Sportswear,* 237 F.3d at 221 (quoting *A.J. Canfield Co.,* 808 F.2d at 296). That leaves the categories

of suggestive or descriptive. With regard to the latter, at a minimum, the Pennzoil mark is presumed

to have secondary meaning, *i.e.,* the mark identifies to consumers the source of the

lubricant/petroleum, because it is undisputed that the PENNZOIL mark has been registered since

_____

the registrant's ownership or right to registration." *Total Containment, Inc. v. Environ Prods.,*
*Inc.,* 921 F.Supp. 1355, 1407 n. 24 (E.D.Pa. 1995) (citing 15 U.S.C. § 1065), *aff'd in part &*
*vacated in part on other grounds,* 106 F.3d 427 (Fed. Cir. 1997). Although Plaintiff has not
presented proof of incontestability as outlined in 15 U.S.C. § 1065, Defendant has conceded that
the mark is incontestable. Therefore, the Court assumes without deciding, for purposes of this
report and recommendation, that incontestability has been established.

1961, and is incontestable. *Beer Nuts,* 805 F.2d at 924. Beyond that, the Court refuses to venture, given the lack of argument by the parties on this point. That being said, the Court concludes that the strength of Plaintiff's mark is sufficiently strong to weigh in favor of likelihood of confusion.

### (3) Price of Goods & Sophistication of Consumers

The third *Lapp* factor examines the price of the goods and other factors which are indicative of the care and attention expected of consumers when making a purchase. In this regard, Plaintiff submits that the relatively small amount Defendant charges for oil change services, particularly in conjunction with the prominent use of Plaintiff's PENNZOIL mark, will not encourage consumers to carefully examine transactions with the Defendant or to make inquiries regarding the source of his products. Plaintiff further submits that customers rarely specify a brand of motor oil, most likely because Defendant's signage prominently and unequivocally stated "We Feature Pennzoil." In response, Defendant posits that his fees for oil change services are lower than that charged by Plaintiff's authorized dealers, and suggests that customers most likely chose his oil change facility, not because they were confused about Lube Pro being an authorized Pennzoil dealer, but rather due to the lower price he charged for an oil change. In support of his argument, Defendant refers the Court to the case of *Artus Corp. v. Nordic Co.,* Civ. A. No. 77-1437 (W.D.Pa.) (Ziegler, J.), but he does not provide any citation to the ruling by the magistrate judge on which he relies.[17] (Def.'s

---

17. Judge Ziegler, in his opinion reported in *Artus Corp. v. Nordic Co.,* 512 F.Supp. 1184, 1192 (W.D.Pa. 1981), indicated that further hearings would be conducted regarding the additional relief sought by the plaintiff. According to Defendant, these hearings were conducted by a magistrate judge, who ultimately found that Artus had not proven damages and the customers of Artus who purchased the Nordic product were not confused, and perhaps purchased the Nordic product simply because that product was lower in price than that of Artus. (Def.'s Mem. (Doc. 39) at 24.) Defendant's reliance on an unpublished, unreported opinion, which is not even attached to his memorandum of law or binding on this Court, is misplaced.

Mem. (Doc. 39) at 24.)

The Court finds that given the relatively small amount charged for the oil change services, and that the purchasers of Defendant's oil change services are ordinary consumers rather than professionals or commercial buyers, Defendant's customers are less likely to carefully examine their transactions with Defendant or to inquire about the source of his products. In *Checkpoint Systems,* the Court of Appeals opined that generally courts have not found a violation of the Lanham Act where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers. 269 F.3d at 284 (citing *Versa Prods. Co. v. Bifold Co. (Mfg.),* 50 F.3d 189, 204 (3d Cir. 1995)). Citing a leading treatise on trademarks, the Court of Appeals noted: "'the price level of the goods or services is an important factor in determining the amount of care the reasonably prudent buyer will use. If the goods or services are relatively expensive, more care is taken and buyers are less likely to be confused as to source or affiliation.'" *Id.* at 284 (quoting J. Thomas McCarthy, 3 *McCarthy on Trademarks & Unfair Competition,* § 23:95 (4th ed. 2000)). The Court of Appeals further noted that likewise:

> "[w]here the relevant buyer class is composed solely of professional, or commercial purchasers, it is reasonable to set a higher standard of care than exists for consumers. [Thus,] where the relevant buyer class is composed of professionals or commercial buyers familiar with the field, they are sophisticated enough not to be confused by trademarks that are closely similar. That is, it is assumed that such professional buyers are less likely to be confused than the ordinary consumer."

*Id.* (quoting 3 *McCarthy on Trademarks,* § 23:101).

On the other hand, purchasers are less likely to exercise a great degree of care in determining the source of a product which is inexpensive, and therefore, the likelihood of confusion is greater. *Blockbuster Entm't,* 869 F.Supp. at 514 (citing *Hindu Incense v. Meadows,* 692 F.2d 1048, 1051 (6th

Cir. 1982)).  Here, the record shows that the cost of an oil change at Defendant's facility ranged from $26.95 to $29.95.  (Smith Dep. at 26, 99-100.)  In addition, the record does not contain any evidence to suggest that the consumers are sophisticated, or are professional or commercial buyers. Accordingly, the Court finds that the cost of an oil change is relatively inexpensive, and therefore, consumers are not likely to exercise a high degree of care in selecting an oil change facility.  Thus, this factor weighs in favor of a likelihood of confusion.

> **(4)** **Length of Time Mark Used by Defendant**
> **Without Evidence of Actual Confusion, and**
> **(6)** **Evidence of Actual Customer Confusion**

Because the evidence is the same for both the fourth and sixth *Lapp* factors, the Court will analyze them together.  The fourth *Lapp* factor considers the length of time the Defendant has used the mark without evidence of actual confusion arising.  "When parties have used similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products, there is an inference that future consumers will not be confused either."  *Fisons,* 30 F.3d at 476 (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1230 (3d Cir. 1978) (finding of no likelihood of confusion was based in part on absence of any evidence of actual confusion over a forty-year period)).  Also, in evaluating this factor, courts should consider whether the products are ones that consumers spend little time and care in selecting, as confusion as to the source of such products  may pass unnoticed.  *Id.*[18]

As to the sixth *Lapp* factor, although evidence of actual confusion is the best evidence of likelihood of confusion, it is not required to find a likelihood of confusion.  *Checkpoint Sys.,* 269

---

18.  In a footnote, the Court of Appeals explained that "'[p]urchasers are unlikely to bother to inform the trademark owner when they are confused about an inexpensive product.'" *Fisons,* 30 F.3d at 476 n. 12 (quoting *Beer Nuts,* 805 F.2d at 928).

F.3d at 291 (citing *Versa Prods.,* 50 F.3d at 205; *Fisons,* 30 F.3d at 476). However, where evidence of actual confusion exists, it may be highly probative of the likelihood of confusion, since such evidence is difficult to find due to many instances going unreported. *Id.* (citations omitted).

With regard to the fourth factor, Plaintiff submits that since actual confusion has been occurring, this factor does not apply. On the other hand, Defendant responds that he has been in business since May of 2004 and Plaintiff has failed to produce any evidence of actual confusion or palming off by either Defendant or his employees.[19] Defendant further submits that he has denied same.[20] As will be shown below, neither representation is accurate.

With regard to evidence of actual confusion, the sixth factor, PQS maintains that Smith has acknowledged multiple instances of actual confusion. In support of this assertion, PQS cites to Smith's deposition testimony and documentary evidence in the form of invoices from vendors. (Pl.'s SUF, ¶¶ 19-23; Pl.'s App., Tabs A & G.) Specifically, PQS characterizes Smith's testimony as stating that the PENNZOIL signage at his oil change facility is causing consumer confusion. (Pl.'s Br. (Doc. 43) at 6.) PQS further submits that Smith testified that customers have inquired whether his Lube Pro location is "Jiffy Lube,"[21] and that people have been confused and thought that Defendant was actually Plaintiff. (*Id.*) With regard to the vendor invoices, PQS submits that the

19. This statement is belied by the record, in particular, Smith's deposition and the vendor invoices.

20. Defendant's bare denial of Plaintiff's evidence and/or legal arguments, without pointing to evidence in the record which supports such denial, is insufficient under Fed.R.Civ.P. 56(e).

21. In its Memorandum of Law in Support of Summary Judgment, PQS states that it owns the Jiffy Lube chain of oil-change centers which feature PENNZOIL lubricants and display PENNZOIL signage; however, PQS does not point to where in the record this fact is established nor does it provide evidence to show that consumers generally associate Jiffy Lubes with PENNZOIL.

invoices demonstrate that companies doing business with Smith sometimes refer to it as "Mars Pennzoil." (*Id.*) PQS cites *Checkpoint Sys., supra,* in support of its position that courts routinely find the existence of actual confusion to be the best indicator of a likelihood of confusion, and place great weight on this evidence.

In response, Smith posits that any confusion that existed was caused by PQS, and it has failed to show the relevancy of the misdirected invoices. (Def.'s Mem., § 6, Part F, ¶¶ 19-23.) In addition to his deposition testimony, Smith proffers his affidavit in support. In his affidavit, Smith denies any attempt by him or any of his employees to: (1) confuse anyone into believing his Lube Pro facility was in any way affiliated with Pennzoil; (2) palm off any oil of any other manufacturer as Pennzoil brand motor oil; and (3) to use any "bait and switch" tactics. (Smith Aff. ¶¶ 15-17.) Smith further avers that none of his customers or suppliers have complained to him about any confusion, palming off, or "bait and switch" tactics. (*Id.* at 18.)[22]

A close review of the deposition transcript shows that Smith testified that on approximately six occasions from May of 2004 until October of 2006, a customer has come into his business asking if it is a Jiffy Lube. (Smith Dep. at 42.) Smith further testified that he believes that the reason why these customers ask if he is a Jiffy Lube is that they have a coupon for Jiffy Lube and they want to know if he will honor the coupon, which he does to generate future business. (*Id.*) According to Smith, some Jiffy Lube facilities are Pennzoil facilities but not all of them. (*Id.*) However, Smith denied that his oil-change business has been referred to from time to time as the "Pennzoil store."

---

22. Defendant further submits that conspicuously absent from the record is any evidence of palming off or bait and switch tactics. Plaintiff responds that by virtue of the fact that Defendant has admitted that his intent in displaying the sign with the PENNZOIL mark was to attract customers, this is evidence of classic palming off, or bait and switch. This argument is addressed *infra* under the fifth *Lapp* factor.

(Smith Dep. at 41.)  Significantly, the Court notes that the record is devoid of any statements, verified or otherwise, from the six consumers who inquired as to whether Defendant's Lube Pro facility was a Jiffy Lube.

The record also contains three invoices from three different vendors sent to Smith's business address–635 Route 228, Mars, PA 16046.  (Pl.'s App., Tab G.)  The first invoice is from Diehl Automotive Group dated August 25, 2005 and addressed to "Mars Pennzoil" at 635 Route 228, Mars, PA.[23]  The second invoice was sent from North Star Pontiac/GMC/Oldsmobile dated April 21, 2005 and addressed to "Pennzoil Lube Pro" at the same address.[24]  The third invoice, a bill of lading from FBC Chemical Corp., is dated October 12, 2004, and addressed to "Lube Pro Pennzoil" at the same address.[25]  When asked to explain why these vendors included a reference to Pennzoil in the name on the invoice, Smith testified that when he placed these orders, the vendors did not have an account set up for his oil change business, Lube Pro, nor did they have his tax I.D. number, as indicated by the blank space next to that line on the Diehl invoice dated August 25, 2005.  (Smith Dep. at 46.)  He explained that he placed the order by phone and the vendors sent the invoices thinking he was a Pennzoil facility.  (*Id.*)  After that, the vendors updated the information in their computers and subsequent invoices were directed to "Lube Pro."  (*Id.*)  As to a fourth invoice dated August 31, 2005 and sent by Diehl to "Pennzoil Express Lube" at 578 Pittsburgh Road, Butler, PA 16002,[26] Smith stated that invoice was sent to him by mistake as it was not addressed to his business,

---

23. This invoice bears Bates stamp no. LP0004945 in Tab G of Pl.'s App.

24. This invoice bears Bates stamp no. LP0004264 in Tab G of Pl.'s App.

25. This invoice bears Bates stamp no. LP0000344 in Tab G of Pl.'s App.

26. This invoice bears Bates stamp no. LP0004946 in Tab G of Pl.'s App.

Lube Pro; rather, the name and address on that invoice is completely different. (Smith Dep. at 47.)

While Smith admitted during his deposition that "somebody" was confused about his facility being a Pennzoil facility, his remark, when taken in context, appears to be in regard to the August 31, 2005 invoice from Diehl. (Smith Dep. at 47.) PQS has taken this statement by Defendant out of context and construed it as an admission by Defendant that the PENNZOIL signage at his oil change facility is causing consumer confusion. The Court does not read Defendant's statement so broadly. Smith also admitted that once in a while he has received Pennzoil mail at his offices,[27] but that this confusion was started by Plaintiff's distributor when he gave the Pennzoil sign to Howard's. (*Id.* at 47-48.)

While it is clear that the Court may consider the vendors' invoices as evidence of actual confusion,[28] there is nothing in the record, however, to suggest that the vendors mistakenly referred to Pennzoil on the invoices because of Defendant's display of the signage containing the PENNZOIL mark. In *Total Containment, supra,* two instances of confusion were noted; however, in neither instance, was any explanation offered as to why the consumer was confused as to the identity of the product.[29] 921 F.Supp. at 1411. The district court concluded that these two instances

---

27. Smith explained that his remark in his deposition regarding occasionally receiving mail intended for Pennzoil was limited to the four invoices noted above. (Def.'s Mem., § 6, Part F, ¶ 23.)

28. *Checkpoint Sys.,* 269 F.3d at 292. In *Checkpoint Sys.,* the Court of Appeals held that the Lanham Act protects against all types of confusion, including initial interest confusion, by not only the consumers of the goods, but also, by experts, the media, and investors. 269 F.3d at 291-92. Initial interest confusion arises when confusion creates initial customer interest, but no actual sale is completed as a result of the confusion. *Id.* at 292 (citing 3 *McCarthy on Trademarks,* §23:6).

29. The two instances of actual confusion noted by the district court included: (1) a letter from a station operator to his parent company complaining about a problem with the alleged infringer's product, but incorrectly identifying it as the trademark owner's product; and (2) a telephone call

of confusion did not constitute clear and convincing evidence of actual confusion and found that factor four weighed in favor of the alleged infringer. *Id.* In the case at bar, Defendant's argument suggests two possible explanations for the confusion with the three invoices, neither of which is predicated on the unauthorized use of the sign displaying the PENNZOIL mark: the confusion could have resulted from outdated information contained in the vendors' computer data bases, or due to the fact that Mr. Howard, a previous owner of Smith's oil change business, operated the facility as a Pennzoil franchise during his ownership. In addition, after the initial confusion with the name on the three invoices, no further instances were reported over a two-year period. Where an alleged infringer sells his product or provides services for an appreciable amount of time without evidence of actual confusion, an inference arises that continued marketing will not lead to consumer confusion in the future. *Checkpoint Sys.,* 269 F.3d at 291. For these reasons, the Court concludes that the vendor invoices do not constitute highly probative evidence of a likelihood of confusion.

Nor does the Court find that the half dozen instances of consumer confusion over Defendant's facility being a Jiffy Lube in a two and one-half year period highly probative of a likelihood of confusion. Again, no statements of the confused consumers were proffered, and Defendant offered a plausible explanation for the confusion. Accordingly, the Court finds that the evidence of actual confusion is insufficient to permit weighing the fourth and sixth *Lapp* factors in Plaintiff's favor.[30]

---

to the trademark owner requesting information about the product of the alleged infringer, whom the caller thought was a subsidiary of the trademark owner. 921 F.Supp. at 1411.

30. In *Holiday Inns of Am., Inc. v. B & B Corp.,* 409 F.2d 614, 617 (3d Cir. 1969), the plaintiff's evidence of actual confusion consisted only of some statements in a deposition of one of the

## (5)    Defendant's Intent in Adopting the Mark

The fifth *Lapp* factor examines the intent of the Defendant in adopting the mark.  As to Defendant's intent, PQS proffers Smith's deposition testimony, wherein he stated that the intent of the road-side sign stating "We Feature PENNZOIL Products" and displaying the PENNZOIL logo was to attract business.  (Smith Dep. at 39-40, 70.)  According to PQS, Smith further testified that less than 5% of his oil inventory consists of genuine PENNZOIL products.  (Smith Dep. at 89-90.) PQS submits that although Smith's primary advertisement is for PENNZOIL products, he does not dispense those products unless a customer specifically requests them.  (Smith Dep. at 18, 34, 39-40, 64-65, 70-73, 144-45.)  According to PQS, Smith's testimony clearly shows that he intended to attract customers through the prominent use of a famous mark and then provide them with less expensive, off-brand products that are unfamiliar even to him.  (Smith Dep. at 127-29**.**)  Defendant responds that his intent in "adopting" the marks was simply to leave up the signs which he paid for and owned and used without knowledge of PQS' contract with Howard, or its letters to Napierkowski.  Defendant further submits that it was his intent to keep up the signs at a time when he could not afford to take down the road-side sign and to replace it.  (Def.'s Mem. (Doc. 39) at 25.)

Although evidence of a party's intentional use of another party's mark to cause confusion is not required to establish a violation of the Lanham Act, evidence of intentional use of another party's mark closely similar to an existing mark, weighs strongly in favor of finding the likelihood of confusion.  *Checkpoint Sys.,* 269 F.3d at 286 (citations omitted).

---

defendants that certain conversations with hotel guests, and correspondence on approximately twelve occasions in one year, disclosed an impression that defendants' operation was affiliated with plaintiff's hotel chain.  The court of appeals found that this evidence of actual confusion was scanty at best.  *Id.*  Here, the evidence of actual confusion from the customers wanting to redeem Jiffy Lube coupons is of comparable quality.

In the present case, the record contains persuasive evidence of intent to cause confusion by Defendant. Through his admissions to Plaintiff's Statement of Undisputed Facts and his deposition testimony, Smith admitted that from the time he purchased Lube Pro in May of 2004 up until sometime after December 2005, he prominently displayed a road-side sign stating, "We Feature PENNZOIL Products" along a main thoroughfare in Mars, Pennsylvania, for the purpose of drawing customers into his oil-change facility. He further admitted that only 100 to 150 gallons of oil out of a total of 5,000 gallons used in 2005 in his oil change facility, *i.e.,* two and three percent, came from PENNZOIL products purchased in one-quart containers, and never in bulk. Smith further testified that he only used PENNZOIL brand products if specifically requested by the customer, and that usually happened less than once a week, and possibly as little as once a month. In fact, less than one percent of Defendant's customers requested a specific brand of motor oil when they come in for an oil change. The primary brands of motor oil used by Defendant in 2005 were AGIP and Ultra Lube. In addition, even after Defendant was informed by PQS of his alleged trademark infringement and PQS requested in writing on three separate occasions that he remove the sign with the PENNZOIL mark, Defendant still refused to remove the sign. Defendant does not deny that he continued to willfully use the PENNZOIL mark and PENNZOIL sign after PQS demanded that he stop, but contends he was justified in doing so because he owned the signage, having acquired it from Napierkowski, and therefore, was not required to stop using it. The Court finds that these admissions by Defendant demonstrate persuasive evidence of an intent to cause confusion, and therefore, are highly probative of a likelihood of confusion..

It is clear that PQS, and not Defendant, owns the PENNZOIL mark, and Defendant is not an authorized dealer of PQS, nor did he seek or obtain PQS's permission to use its mark. Therefore,

the fact that Defendant believed he owned the sign is of no moment here.  Moreover, prior to instituting the present lawsuit, PQS and/or its agent clearly informed Defendant that he did not own the sign as per their lease agreement with a predecessor in interest.  Rather than attempt to resolve the issue prior to litigation or consult an attorney, Defendant chose to ignore the letter and continued to display the sign like the proverbial ostrich with its head in the sand.  The Court will not reward Defendant for such dilatory conduct. Had he simply removed the infringing sign as PQS requested, Defendant could have avoided this entire lawsuit.

A case which is very similar factually to the case at bar is *Prompt Elec. Supply Co., Inc. v. Allen-Bradley Co.*, 492 F.Supp. 344, 210 U.S.P.Q. 569 (E.D.N.Y. 1980).  In that case, after the plaintiff was no longer an authorized distributor of defendant's products, it continued to display defendant's sign and trademarks at its place of business without defendant's permission.  *Id.* at 571. The defendant produced evidence to show that only its authorized distributors are permitted to display its sign and trademark and plaintiff had been terminated as a distributor.  *Id.* at 572.  The court further noted that fixed to the facade of plaintiff's place of business is  the defendant's sign containing its distinctive trademark and the words "Allen-Bradley Motor Control Headquarters," which is placed  next to a sign containing the name of plaintiff's business and generic descriptions such as "lighting fixtures" and "electrical supplies."  *Id.*  The plaintiff did not display the signs or trademarks of any other distributors on the facade of his place of business.  In light of those facts, the Court found that a clear inference could be drawn that plaintiff held itself out to be an authorized distributor of defendant, not merely a seller of its parts, through the use of defendant's sign on the facade of its building.  *Id.*    The court rejected plaintiff's defense that it was merely using the defendant's sign to advertise that it sold defendant's products, noting that without more, that defense

was inadequate. *Id.* at 572. Accordingly, the court held the continuing unauthorized use of sign and trademark presented likelihood of confusion that infringer was authorized dealer of owner's products and granted injunctive relief. *Id.* at 572-73.

Similarly here, Defendant Smith continued to display the sign "We Feature PENNZOIL Products" even though he was not an authorized dealer of PENNZOIL products and after he had been informed that he did not own the sign and requested to take it down. In addition, the "We Feature PENNZOIL Products" sign was placed along side a Lube Pro sign and displayed in a prominent location on Defendant's business premises. No other distributors signs or trademarks appear in that location, thus giving consumers the impression that Defendant is an authorized distributor of PENNZOIL products. Therefore, based on *Prompt Elec.,* Plaintiff has established a strong likelihood of confusion, entitling it to injunctive relief.

Accordingly, the Court finds that the fifth *Lapp* factor weighs strongly in Plaintiff's favor.

### (7) Marketing/Advertising of Non-Competing Goods Through Same Channels of Trade

The seventh *Lapp* factor considers whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media. PQS submits that since it and its licensees, as well as Defendant, operate oil change centers, the channels of trade are identical. Defendant has not provided a response on this factor, from which the Court infers that Defendant agrees with Plaintiff. Courts have held that as to the seventh factor, "'the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion.'" *Checkpoint Sys.,* 269 F.3d at 288-89 (citation omitted). While the record does not contain any evidence as to the trade exhibitions, publications, or other media used by the parties in marketing their oil change services, or as to how the parties use their respective sales forces to sell their

products to consumers, this lack of evidence does not weigh against the likelihood of confusion. This factor simply does not apply here because it addresses non-competing goods, and the parties directly compete as they both operate oil change facilities in the same geographical market.

### (8) Similarity of Targets of Parties' Sales Efforts

As to the eighth *Lapp* factor, PQS argues that both parties share the same customer base–general motorists and fleet vehicles. Defendant has not provided a response to this factor, from which the Court infers that Defendant agrees with Plaintiff. It is obvious from the record that the parties operate directly competing oil change businesses in the same geographic area, and therefore, their customer base significantly overlaps. When parties target the same consumers through their sales efforts, a stronger likelihood of confusion exists. *Checkpoint Sys.,* 269 F.3d at 289 (citing *Lapp,* 721 F.2d at 463-64). Therefore, this factor weighs in Plaintiff's favor.

### (9) Relationship of Goods in Consumers' Minds<br>Because of Similarity of Function

With regard to the ninth *Lapp* factor, PQS maintains that this factor does not apply here because the parties' services are identical. Defendant responds that PQS has not produced any evidence regarding the state of mind of consumers with regard to the services and/or products involved here. The Court agrees with PQS that this factor does not apply here. The ninth factor is applied only where the goods or services are not competing or do not occupy the same markets. Since the evidence shows that the parties here are in direct competition for the same services, the Court finds the ninth *Lapp* factor does not apply.

### (10) Other Factors Indicating Consumers Might Expect Prior Owner to Compete in Same Market or Expand Into That Market

As to the tenth *Lapp* factor, PQS submits that this factor does not apply here because the parties' services are identical. Defendant, on the other hand, responds again that PQS has failed to produce any evidence that he is likely to expand, or that he is even financially able to expand, or that the consuming public may expect him to expand. For the reasons stated with regard to the ninth *Lapp* factor, the Court finds the tenth factor likewise has little relevance here.[31]

### Totality of *Lapp* Factors

In summary, the Court applied seven of the ten *Lapp* factors to the evidence in this case and concluded that five of the seven factors weighed in favor of a likelihood of confusion. Significantly, the Court found that mark similarity, the most important factor in a case such as this where the parties are in direct competition, strongly favored a likelihood of confusion. Similarly, the Court found strong evidence that Defendant's intent in adopting the mark was to cause consumer confusion. Moreover, although the evidence was not as strong, the strength of Plaintiff's mark also favored a likelihood of confusion, as did the price of an oil change, and the similarity of targeted consumers. On the other hand, the Court found that the length of time that the mark was used without evidence of actual confusion, and instances of actual confusion, did not weigh in Plaintiff's favor. Although there was some evidence of actual customer confusion, it was not highly probative due to the lack of documentation that the reason for the confusion was the display of the PENNZOIL marks, while alternative explanations existed for the confusion. Factors four and six are not

_____

31. The Court of Appeals has indicated that with regard to factor ten, evidence of converging markets is "'pivotal in non-competing products cases.'" *Checkpoint Sys.,* 269 F.3d at 290 (quoting *Lapp,* 721 F.2d at 463).

determinative, however, as they are outweighed in both quality and quantity by the Court's findings as to the other factors.

Accordingly, the Court concludes that the combination of the *Lapp* factors delineated above establishes a substantial likelihood of confusion. *See Holiday Inns of Am., Inc. v. B & B Corp.,* 409 F.2d 614, 617 (3d Cir. 1969);[32] *Prompt Elec. Supply Co.,* 210 U.S.P.Q. at 572-73. Therefore, the Court holds that Plaintiff is entitled to injunctive relief on its claims of federal trademark infringement and unfair competition, and common law trademark infringement and unfair competition under Pennsylvania law.

### b.    Trademark Counterfeiting (Count II)

Plaintiff also moves for summary judgment on its claim of trademark counterfeiting under the Lanham Act. Section 1114(1) prohibits the use in commerce of any counterfeit of a registered mark or the actual counterfeiting of any registered mark in connection with the sale, distribution or advertising of goods or services which is likely to cause confusion or mistake, or to deceive. 15 U.S.C. § 1114(1)(a) & (b). For purposes of a federal counterfeiting claim under the Lanham Act, the term "counterfeit mark" is defined as "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought

---

32. The Court's conclusion is buttressed by the Third Circuit's decision in *Holiday Inns of Am., Inc. v. B & B Corp.,* 409 F.2d 614, 617 (3d Cir. 1969), wherein the court of appeals held that because the appropriate test is a likelihood of confusion, not actual confusion, the plaintiff could have rested its case on the proposition that use of the identical mark upon identical services is alone sufficient to establish a likelihood of success where it is accompanied by proof of an additional factor–that the identical names are present in the same market place to compete for the same customers. In the case at bar, the evidence establishes that the marks are identical, as are the services and customers, which would appear to be sufficient under *Holiday Inns* to establish a likelihood of confusion.

knew such mark was so registered; or a spurious designation that is identical with, or substantially indistinguishable from, a [registered mark]." 15 U.S.C. §§ 1116(d)(1)(B)(i) & (ii), 1127. However, a counterfeit mark does not include any mark or designation for which the manufacturer or producer had authorization to use at the time of manufacture or production. 15 U.S.C. §§ 1116(d)(1)(B). Thus, to establish a claim of trademark counterfeiting, a plaintiff must prove that: (1) the defendant "infringed a registered trademark in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a), and (2) intentionally used the trademark knowing that i[t] was counterfeit or was willfully blind to such use." *Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F. Supp. 2d 567, 580-81 (E.D.Pa. 2002) (citing *Playboy Enter., Inc. v. Universal Tel-A-Talk, Inc.,* No. Civ.A. 96-6961, 1998 WL 767440, at *7 (E.D.Pa. Nov. 3, 1998)). The only material difference between the standard for federal trademark infringement and trademark counterfeiting is the requirement of proving defendant intentionally used the plaintiff's trademark, knowing it was a counterfeit, which, if proven, entitles the plaintiff to an award of treble and/or statutory damages. *Playboy Enter., Inc. v. Universal Tel-A-Talk, Inc.,* 48 U.S.P.Q.2d 1779, 1782, 1998 WL 288423, at * 3 (E.D.Pa. Jun. 3, 1998) (citing 15 U.S.C. § 1117(b) & (c)).

In support of its motion for summary judgment on it federal trademark counterfeiting claim, Plaintiff posits that it has conclusively established that Defendant is using counterfeits of the federally registered PENNZOIL marks for the goods and services covered by Plaintiff's registrations. In particular, Plaintiff submits that Defendant, in connection with the same products and services at Lube Pro, has displayed its registered mark covering lubricant oils and greases on the road-side sign, and had displayed its registered mark covering automobile service stations on the side of the Lube Pro facility and also inside the work bay. Plaintiff further argues that the fact that

Defendant's mark is identical to Plaintiff's mark, rather than a mere simulation, does not minimize the counterfeit nature of the goods and services associated with them, and cites in support *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.,* 425 F.3d 708, 722 (9th Cir. 2005). Finally, Plaintiff submits that Defendant's use of these counterfeit marks was intentional, as demonstrated by his admission that his purpose in displaying the road-side sign is to attract customers, that he displays PENNZOIL signs more prominently than any other brand of motor oil while less than five percent of his inventory consist of genuine PENNZOIL products, and he does not use PENNZOIL products unless specifically requested to do so.

The Court has searched at length in Defendant's memorandum of law for his argument in opposition. Far from a model of clarity, Defendant's memorandum does not appear to provide any legal argument or authority in opposing Plaintiff's request for summary judgment on its trademark counterfeiting claim, other than two conclusory statements denying that the signs, signage or product labels were or are spurious counterfeit marks, reproductions, counterfeit or colorable imitations, and denying that Plaintiff has failed to produce evidence of same. (Def.'s Mem. of Law (Doc. 39) at 34 & 38.) It is well settled that conclusory statements fall short of the substantive legal analysis required to bring an issue before the court. *Massie v. U.S. Dep't of Hous. & Urban Devel.,* C.A. No. 06-1004, 2007 WL 184827, *3 n.5 (W.D.Pa. Jan. 19, 2007) (citing *Pennsylvania v. U.S. Dep't of Health & Human Serv.,* 101 F.3d 939, 945 (3d Cir. 1996) ("stating that conclusory assertions, unaccompanied by a substantial argument, will not suffice to bring an issue before the court")), *vacated in part on other grounds on reconsideration,* 2007 WL 674597 (W.D.Pa. Mar. 1, 2007). Despite this inadequacy in Defendant's argument, the Court finds, as a threshold matter, that Plaintiff has failed to establish as a matter of law, an essential element of its claim–that the marks

in question are counterfeit.

The plain language of the statute indicates that the term "counterfeit" refers to the mark itself, not the nature of the goods and services associated with the mark as Plaintiff suggests. Moreover, even if Plaintiff's statement of the law was correct, in this case there were no actual counterfeit goods or services attached to the PENNZOIL marks. The facts here show that the marks used by Defendant were genuine PENNZOIL marks, not counterfeits, copies or reproductions, and said marks were used on signs to attract customers into his oil change business, but were not "attached to" the non-PENNZOIL products/lubricants he actually used in his oil change facility. Plaintiff's reliance on *Idaho Potato Comm'n* is misplaced, as that case involved the unauthorized use of a certification mark, as distinguished from a trademark.[33] Thus, *Idaho Potato Comm'n* is distinguishable both legally and factually and not dispositive here.

The Court finds instructive the decision of the Sixth Circuit Court of Appeals in *U. S. Structures, Inc. v. J. P. Structures, Inc.,* 130 F.3d 1185 (6th Cir. 1997), which involved a holdover franchisee who continued to use the franchisor's original trademark after the franchise had been terminated. There the court of appeals held that "[a]lthough the use of an original trademark is without authorization, it is not the use of a counterfeit mark." *Id.* at 1192; *see also Motor City Bagels, L.L.C. v. Am. Bagel Co.,* 50 F.Supp. 2d 460, 489 (D. Md. 1999) (citing *U.S. Structures, supra*) (same). Although the Defendant here was never an authorized distributor of PENNZOIL

---

33. The Ninth Circuit specifically noted that certification marks differed from trademarks in a number of significant ways which impacted its analysis of the counterfeiting claim. 425 F.3d at 716 (citing 3 *McCarthy on Trademarks*, § 19:91 (4th ed. 2005) ("A certification mark is a special creature for a purpose uniquely different from that of an ordinary trademark or service mark."). For example, certification marks are subject to cancellation, if certain conditions occur. *Id.* In addition, certification marks serve other public interests besides the prevention of public confusion. *Id.*

products, and therefore, was never authorized to use the PENNZOIL marks, the Court finds that his use of the original trademark after he acquired ownership of the Lube Pro, without authorization from Plaintiff, constitutes infringement, but is not the use of a counterfeit mark.

Accordingly, the Court finds, as a matter of law, that Plaintiff has failed to establish an essential element of its trademark counterfeiting claim, and therefore recommends that Plaintiff's motion for summary judgment on this claim be denied. It is further recommended that summary judgment be entered in Defendant's favor on this claim.

### c.    *False Advertising (Count VII)*

Next, Plaintiff moves for summary judgment on its claim for false advertising under Section 43(a) of the Lanham Act. To prevail on a claim for false advertising under the Lanham Act, a plaintiff must prove that the defendant:

> "use[d] in commerce any word, term, name, symbol, or device or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . .."

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 136 (3d Cir. 2005) (quoting 15 U.S.C. § 1125(a)(1)(B)). As to the latter requirement, a plaintiff can satisfy its burden by demonstrating one of two things–either that the commercial message is literally false, or the commercial message is literally true or ambiguous with the tendency to deceive consumers. *Id.* (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,* 290 F.3d 578, 586 (3d Cir. 2002)). If the plaintiff establishes that the commercial message is literally false, then it need not show that the buying public was misled. *Id.* (citing *Johnson & Johnson-Merck*

*Consumer v. Rhone-Poulenc Rorer Pharm., Inc.,* 19 F.3d 125, 129-30 (3d Cir. 1994)). However,

if it cannot show literal falsity, then plaintiff must establish "'actual deception or at least a tendency

to deceive a substantial portion of the intended audience.'" *Id.* (quoting *Rhone-Poulenc,* 19 F.3d at

129).

In support of its motion for summary judgment on its false advertising claim, Plaintiff argues

that it has conclusively established each element of its claim. In particular, Plaintiff submits that

Defendant has committed false advertising in two respects. First, Plaintiff submits that Defendant's

signage misleads consumers into believing that he is, or is affiliated with, Plaintiff. Consequently,

Defendant is misrepresenting the origin of his services. Second, Plaintiff contends that Defendant

attracts customers to his business by using its trademarks, but uses a different, less expensive

product in place of Plaintiff's product, and therefore, Defendant misrepresents the nature and quality

of his goods by representing them as PENNZOIL brand goods when they are not.[34] Plaintiff further

submits that a substantial portion of consumers have been deceived as demonstrated by the

numerous instances of confusion reported by Defendant. Other than conclusory denials about

engaging in such "bait-and-switch" tactics, Defendant does not offer any argument in opposition to

Plaintiff's false advertising claim.

The Court finds that the record evidence here establishes literal falsity in the form of a "bait-

---

34. Plaintiff posits that this form of false advertising amounts to a "bait-and-switch" operation, which tactic is deemed unlawful by the Federal Trade Commission under 15 U.S.C. § 45(a), and cites in support *Tashof v. Fed. Trade Comm'n,* 437 F.2d 707, 709 (D.C. Cir. 1970); 16 C.F.R. § 238.0 (2006). Plaintiff submits the fact that Defendant may maintain a handful of bona fide PENNZOIL products does not change the false nature of his advertising. *Tashof,* 437 F.2d at 710 n. 8. The Court agrees. A small amount of sales of the advertised PENNZOIL products is merely an incidental by-product of the fundamental bait and switch operation, and adds an aura of legitimacy to the overall operation. *Id.*

and-switch" operation. In this case, the commercial message conveyed by Defendant is that he "features PENNZOIL products" when in fact only two to three percent of the oil used in his oil change business is PENNZOIL brand motor oil. Defendant admitted that he prominently displayed the road-side sign to draw customers into his oil-change facility, and then proceeded to use either AGIP or Ultra Lube products over 97 percent of the time. These admissions demonstrate the literal falsity of Defendant's commercial advertising.[35] In addition, the "switch" may be inferred from the evidence of bait advertising and minimal sales of the advertised PENNZOIL products. *Tashof v. Fed. Trade Comm'n,* 437 F.2d 707, 710 n. 8 (D.C. Cir. 1970). Accordingly, the Court finds that Plaintiff has established the elements of its false advertising claim under the Lanham Act. Therefore, the Court recommends that summary judgment be granted in Plaintiff's favor on this claim.

### d.     Federal & State Trademark Dilution Claims (Counts IV & VI)

Plaintiff also requests that summary judgment be entered in its favor on its claims of federal trademark dilution and state trademark dilution under Pennsylvania law.[36] To set forth a *prima facie*

---

35. The Court rejects Plaintiff's argument that a substantial portion of consumers have been deceived as demonstrated by the numerous instances of confusion reported by Defendant. Plaintiff's proof is thin at best, for the reasons set forth above in relation to the fourth and sixth *Lapp* factors.

36. In its own motion for summary judgment, Plaintiff did not move for summary judgment on these claims. However, Defendant has moved for summary judgment on all claims, and in response, Plaintiff requests that summary judgment be entered in its favor on its federal and state trademark dilution claims. The Court may enter summary judgment in the nonmovant's favor where it believes that the movant has had adequate notice of the basis for that judgment, and where clear support exists for such judgment. *Banks v. Lackawanna County Comm'rs,* 931 F.Supp. 359, 363 n. 7 (M.D.Pa. 1996) (citing 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Proc.,* § 2720 at 29-35 (1983) (other citation omitted). While Defendant has had adequate notice of the basis for Plaintiff's request for summary judgment on the federal and state trademark dilution claims, the Court finds that Plaintiff has not

claim for relief under the Federal Trademark Dilution Act of 1995 ("FTDA"), a plaintiff must plead and prove that: (1) the plaintiff owns a famous mark that is distinctive, inherently or through acquired distinctiveness; (2) the defendant makes use in interstate commerce of a mark or trade name; (3) the defendant's use began after the plaintiff's mark became famous; and (4) the defendant's use is likely to cause dilution by blurring or dilution by tarnishment of the famous mark. 15 U.S.C. § 1125(c)(1) (2006); *Diane Von Furstenberg Studio v. Snyder,* No. 1:06cv1356 (JCC), 2007 U.S. Dist. LEXIS 66633, * 10 (E.D.Va. Sept. 10, 2007).[37]  The standard under Pennsylvania statutory law for establishing trademark dilution[38] is substantially similar to the FTDA, *Louis Vuitton*, 211 F.Supp.2d at 582, with the exception that the Pennsylvania statute retains the FTDA's pre-2006 amendment standard in prong four, *i.e.,* "causes dilution."  Thus, the standard for proving trademark dilution is more easily met under federal law than under Pennsylvania law.

As to determining whether a particular mark is famous, the FTDA states that a "mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A). To assist courts in making this determination, Congress has set forth four factors which, if relevant, may be considered in assessing whether a particular mark possesses the requisite degree of recognition.  15 U.S.C. § 1125(c)(2)(A)(i) - (iv).[39]  It is clear from the multi-factor standards and

---

met its burden of proof as to the *prima facie* elements of its dilution claims.

37.  In 2006, Congress amended the Federal Trademark Dilution Act to change the causation requirement in prong four from "causes dilution" to "likely to cause dilution."  *Diane Von Furstenberg Studio*, 2007 U.S. Dist. LEXIS 66633, at * 10 (citing 15 U.S.C.S. § 1125(c)).

38.  The Pennsylvania statute on trademark dilution is codified at 54 Pa. Con. Stat. Ann. § 1124.

39.  The 2006 amendment to the FTDA also sets forth definitions of "dilution by blurring" and "dilution by tarnishment," and lists six factors to be considered with regard to the former.  15

legislative history to the FTDA that the level of recognition required for a mark to be deemed famous under the FTDA is greater than that required for trademark infringement. *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.,* 212 F.3d 157, 171 (3d Cir. 2000) (Barry, J., dissenting) (citing S.Rep. No. 100-515, *reprinted in* 1988 U.S.C.C.A.N. 5577, at 5604). Indeed, Congress has provided examples of marks it considers truly famous, such as "Kodak," "Buick," and "Dupont." *Id.* (citing H.R. Rep. No. 104-374 at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 1029, 1031).

In support of its request for summary judgment on its claims of trademark dilution under the FTDA and Pennsylvania dilution statute, Plaintiff argues merely that "[t]here is no genuine dispute that all of the elements of these claims are present here." (Pl.'s Mem. in Opp'n to Def.'s Cross-Mot. for Summ. J. & in Further Support of Pl.'s Mot. for Summ. J. (Doc. 47) at 23-24.) Given the number of factors to be evaluated in determining whether Plaintiff's mark has achieved the requisite level of recognition to be deemed famous, and Plaintiff's lack of legal analysis and proffered evidence on this point, the Court finds that Plaintiff has failed to establish entitlement to injunctive relief under the FTDA or the Pennsylvania dilution statute. Accordingly, the Court recommends that summary judgment be entered in favor of Defendant on these claims.

### e. *Unjust Enrichment (Count VIII)*

In support of summary judgment on this claim, Plaintiff recites the elements of unjust enrichment and asserts in conclusory fashion that there is no genuine dispute that all of these elements have been met here. However, Plaintiff offers no legal argument and analysis in support

---

U.S.C. § 1125(c)(2)(B) & (C).

thereof, which precludes the Court from considering Plaintiff's request. *See Massie*, 2007 WL 184827, at *3 n.5 (citation omitted) (conclusory assertions, unaccompanied by a substantial argument, will not suffice to bring an issue before the court). Moreover, Plaintiff did not move for summary judgment on its unjust enrichment claim, but requests summary judgment be entered in its favor on this claim in response to Defendant's motion for summary judgment. Given the lack of development of the legal argument and analysis, neither the Defendant nor the Court has adequate notice of the basis of Plaintiff's claim/argument. *See* Note 36, *supra.*

Therefore, the Court finds that Plaintiff has failed as a matter of law to establish the elements of an unjust enrichment claim. Accordingly, the Court recommends that summary judgment be entered in favor of Defendant on this claim.

### 2. Defendant's Affirmative Defenses

In opposition to Plaintiff's motion for summary judgment, Defendant raises several additional affirmative defenses not previously addressed, including failure to join two indispensable parties (Mr. Howard and Mr. Napierkowski), abandonment, dilution by Plaintiff of its own mark, acquiescence, waiver, laches, estoppel, unclean hands, nominal fairness of use, and statute of limitations. Plaintiff has filed a response, with supporting analysis and legal authority, denying that any of these affirmative defenses apply and seeking summary judgment in its favor. For the reasons that follow, the Court finds that none of these defenses have any merit.

### a. Failure to Join Indispensable Parties

Defendant asserts that Plaintiff has failed to name two indispensable parties, namely Mr. Howard and Mr. Napierkowski, his predecessors in title. In support of this argument, Defendant submits that Plaintiff has never sought any remedy or relief from either Howard or Napierkowski

for the alleged wrongful selling of the road-side sign. (Def.'s Mem. (Doc. 39) at 35.) This argument is completely devoid of merit. Under Fed.R.Civ.P. 19(a)(1), joinder of a person, who is subject to service of process and whose joinder will not deprive the court of subject matter jurisdiction, is required in one of two situations: (1) where complete relief cannot be accorded among the existing parties in that person's absence; or (2) where that person claims an interest relating to the subject of the law suit and is so situated that disposing of the action in the person's absence may impair the person's ability to protect the interest or leave an existing party subject to a substantial risk of incurring multiple or inconsistent obligations because of the interest. Defendant has failed to show that either situation is present here. Therefore, the Court recommends a finding in favor of Plaintiff on this affirmative defense.

### b.  *Abandonment*

Defendant's next affirmative defense is that in 2000 or 2001, Plaintiff abandoned the road-side sign containing the PENNZOIL mark. Although Defendant fails to offer any additional argument or support on this defense, it appears that he is referring to when Mr. Howard sold the oil change business to Napierkowski, and Plaintiff allegedly did not attempt to retrieve its signs.

Section 45 of the Lanham Act sets forth two instances where abandonment of a trademark will be deemed to have occurred:

> (1)  When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

> (2)  When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with

which it is used or otherwise to lose its significance as a mark.

15 U.S.C. § 1127.  Defendant's argument appears directed to the first instance of abandonment.

In this case,  the evidence of record shows that on at least two occasions, shortly after Plaintiff discovered the sale of the business to Napierkowski, it sent letters to Napierkowski demanding that he cease and desist from using the PENNZOIL mark in association with the sales of bulk lubricants and displaying the PENNZOIL sign.  Before Plaintiff could take any further action against Napierkowski, he sold the business to Defendant.  As soon as Plaintiff discovered that Napierkowski sold the business to Defendant, Plaintiff sent three letters requesting removal and return of its sign, and Plaintiff's agent visited Defendant's place of business and demanded same on at least one occasion.  The Court finds that the undisputed evidence of record does not establish any express or inferred intent to abandon its mark or the sign displaying its PENNZOIL mark. Accordingly, the Court recommends a finding in favor of Plaintiff on this affirmative defense.

### c.    *Dilution by Plaintiff of its Own Mark*

Defendant contends that Plaintiff has diluted its own trademark by (1) "giving away its trademark to unrelated business (sic) and/or competitors such as Mr. Napierkowski;" (2) "[s]elling its trademark online without restrictions to anyone including competitors[;]" and (3) "[s]elling its product in bulk with its logo to anyone including competitors, without restrictions on its use or resell and doing so at retail outlets such as Costcos, WalMart and Sam's Club at discount prices." (Def.'s Mem. (Doc. 39) at 35.)  Defendant's argument is completely meritless as it consists mainly of speculation, nonverified facts, and conclusory statements and  arguments.  As to Defendant's contention, the Court finds this is pure speculation without any evidentiary support in the record. As to the second and third contentions, again there is no evidentiary foundation as to the particular

facts of these sales, nor does Defendant cite any legal authority that would support his novel theory that a trademark owner's sales via the internet or through warehouse stores of its trademarked products, without more, somehow negate its ownership rights to its marks.

In support of this novel theory, Defendant offers a plethora of irrelevant and non-material evidence[40] in addition to his deposition testimony that he purchased PENNZOIL lubricants at Costco, WalMart and Sam's Club. For the most part, this evidence is unverified as it is not accompanied by a supporting affidavit, but in any event, its lack of relevance precludes Defendant's reliance on it to justify his unauthorized use of Plaintiff's PENNZOIL mark on signs used to lure customers into his oil change facility, giving them the mistaken impression that he featured PENNZOIL lubricants. Just because a number of items bearing the PENNZOIL marks and logos appear in various ads, NASCAR sponsorships, websites, catalogs, photographs or the like, their mere existence does not provide the Court with any basis from which to conclude that Plaintiff somehow released its marks/logo to the public at large to use in whatever way they wanted. In addition, because this evidence is neither material or relevant, it does not create a genuine issue of fact. Accordingly, the Court recommends a finding in favor of Plaintiff on this novel defense theory.

### d.     Acquiescence, Laches, Estoppel & Waiver

---

40. This evidence consists of printouts from Plaintiff's website offering various promotional items with the PENNZOIL logos for sale, and his "newly discovered evidence," which consists of a photo of a NASCAR stock car sponsored by Plaintiff and bearing the PENNZOIL logo; two catalogs, one containing nostalgic reproductions of various oil companies' signs, including PENNZOIL, and the other containing oil change center and carwash supplies with photos of PENNZOIL products; a promotional offer for a SHELL ROTELLA sign; and photos of a tanker truck bearing a SHELL logo.

The equitable defenses of acquiescence, laches, estoppel and waiver are related and therefore will be considered together. Generally, estoppel is not considered a separate defense, but rather, is referred to as either "estoppel by laches" or "estoppel by acquiescence." *Analytic Recruiting, Inc. v. Analytic Res., L.L.C.,* 156 F. Supp. 2d 499, 515 (E.D.Pa. 2001) (citing *Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assurance Co.*, 943 F.Supp. 509, 517 n. 5 (E.D.Pa.1996) (citing 4 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* §§ 30.01-30.03 (3d ed. 1996)). When asserting an estoppel defense, the defendant is claiming in essence that he changed his position in reliance upon the misleading representation of the plaintiff. *Id.* (citation omitted).

Laches consists of two elements: (1) plaintiff's delay in instituting suit is inexcusable; and (2) defendant was prejudiced by such delay. *Santana Prods.,* 401 F.3d at 138 (citing *Univ. of Pittsburgh v. Champion Prods., Inc.,* 686 F.2d 1040, 1044 (3d Cir. 1982)). Where a plaintiff files suit before the analogous state statute of limitations runs, the defendant bears the burden of showing that plaintiff's delay, if any, in instituting suit was inexcusable and the defendant suffered prejudice from the inexcusable delay. On the other hand, if the plaintiff files suit after the analogous state statute of limitations has run, then the defendant enjoys the benefit of the presumption that plaintiff's delay in instituting suit was inexcusable and defendant suffered prejudice from the delay. The burden then shifts to plaintiff to rebut this presumption. *Id.* at 138-39 (citing *E.E.O.C. v. Great Atlantic & Pacific Tea Co.*, 735 F.2d 69, 80-81 (3d Cir.1984)). The Court of Appeals has held that claims for trademark infringement, unfair competition and false advertising under Section 43(a) of the Lanham Act are most analogous to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, which has a six-year "catch-all" limitation period. *Id.* at 138 (citations omitted). In the case at bar, Defendant acquired the oil change business in May of 2004, and Plaintiff first

learned of that acquisition sometime between May of 2004 and October 2004, when it sent the first of three cease and desist letters. Plaintiff instituted the present action in October 2005, approximately 17 months after Defendant acquired the business and first engaged in the infringing conduct and Plaintiff discovered these facts. Consequently, Plaintiff filed suit before the expiration of the applicable statute of limitations,[41] and thus, Defendant bears the burden of establish both elements of laches.

"The doctrine of acquiescence applies when the trademark owner, by affirmative word or deed, conveys its implied consent to another" to use its name or mark. *Pappan Enter., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998) (citing 4 *McCarthy on Trademarks & Unfair Competition* § 31.51 at 31-76 (4th ed. 1997)). Finally, "waiver, in the strict sense, is the intentional relinquishment of a known right." *Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 F.2d 47, 51 (3d Cir. 1988) (citation omitted).

Defendant's theory as to these defenses is that since 2000 or 2001, Pennzoil has acquiesced to the use of its road-side sign by Napierkowski, and then by Defendant, and/or is estopped and/or is guilty of laches. Defendant further asserts if Plaintiff had not allowed Mr. Napierkowski to use the sign for four years, Defendant "would, for the sake of argument, not [have] been under the impression that his use of the sign was legal and/or the sign would have been removed prior to [Defendant]'s purchase of the sign. Defendant's argument completely misses the mark.

First, there simply is no evidence here to show that Defendant changed his position in

---

41. In his Answer to the Complaint, Defendant also pleads statute of limitations as an affirmative defense, but he does not raise it in his motion for summary judgment. In any event, such defense is not available here as the record clearly shows that Plaintiff instituted suit within the six-year statute of limitations which has not yet expired.

reliance upon a misleading representation made by the Plaintiff. Defendant has always maintained that he owned the signage in question. Moreover, he fails to identify what, if any, misleading misrepresentation was made to him that actually caused him to change his position. Second, Defendant has failed to establish both elements of his laches defense. The delay here was minimal; from the time Defendant acquired the business in May of 2004, until this law suit was filed in October 2005, only 17 months had passed, mostly due to Plaintiff's attempt to resolve this dispute out of court and Defendant's failure to respond to Plaintiff's cease and desist letters. Shortly after learning that Defendant acquired the business from Napierkowski, counsel for Plaintiff sent a cease and desist letter (in October 2004), followed by two more letters in December of 2004 and March of 2005. Under these circumstances, the Court cannot find any basis for finding inexcusable delay. Likewise, Defendant has not proffered any explanation as to how he has been prejudiced by this delay. Third, with regard to acquiescence, the Defendant again fails to identify any affirmative words or acts by Plaintiff that can be construed as conveying its implied consent to the use of its signs containing the PENNZOIL mark by Defendant. The record evidence here shows exactly the opposite–that Plaintiff repeatedly attempted to get both Napierkowski and Defendant to cease and desist from displaying the signs with its PENNZOIL marks. This conduct hardly constitutes acquiescence. Finally, as to the waiver defense, Defendant offers no legal argument or authority in support of this defense. As noted earlier, it is well settled that conclusory statements fall short of the substantive legal analysis required to bring an issue before the court. *Massie*, 2007 WL 184827, at *3 n.5 (citation omitted) (conclusory assertions, unaccompanied by a substantial argument, will not suffice to bring an issue before the court).

Because Defendant has failed to meet his burden of proving the defenses of estoppel, laches,

acquiescence and waiver, the Court recommends that summary judgment be granted in Plaintiff's favor on these affirmative defenses.

### e.    Unclean Hands

Essentially, courts will apply the equitable doctrine of unclean hands when the "party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Highmark, Inc. v. UPMC Health Plan, Inc.,* 276 F.3d 160, 174 (3d Cir. 2001) (citing *Keystone Driller Co. v. Gen. Excavator Co.,* 290 U.S. 240, 245 (1933)). "The nexus 'between the misconduct and the claim must be close.'" *Id.* (citing *In re New Valley Corp.,* 181 F.3d 517, 525 (3d Cir. 1999)).

Defendant's defense of unclean hands is predicated on his claims that Plaintiff is engaged in unfair trade practices[42] by virtue of its palming off and false designation of origin of geographic source of its products.  In this regard, Defendant asserts that PQS is a Delaware Corporation, which is owned by a Texas Corporation, which in turn is owned by an international corporation.  Defendant further asserts that no oil products produced by PQS come from the geographic area of Pennsylvania, despite the fact that PENNZOIL uses "Pennsylvania" and "Quaker State" in its name, the Pittsburgh Steeler black and gold colors in its color scheme, and the Liberty Bell in its logo. (Def.'s Mem. (Doc. 39) at 36.)   Defendant contends that by using the PENNZOIL mark and logo, Plaintiff is palming off foreign oil to the citizens of Pennsylvania as "Pennsylvania grade oil" and/or as "100% PURE PENNSYLVANIA" and/or "Supreme Pennsylvania Quality."   (Def.'s Mem.

---

42. In his Answer to the Complaint, Defendant asserts as a defense that Plaintiff's use of its marks as set forth in its Complaint constitutes a violation of the UTPCPL, 73 P.S. § 201-1 *et seq.* (Answer, ¶ 59.)  Defendant does not offer any argument or analysis of the required elements of a violation of the UTPCPL.  Therefore, the Court finds that Defendant has failed to prove entitlement to the defense that Plaintiff violated the UTPCPL.

(Doc.39) at 36.)  In support of this argument, Defendant proffers two nostalgic tin signs (Exhibits 54 and 55) depicted in a catalog selling nostalgic reproductions of tin signs from various oil companies, which state, respectively, "100% PURE PENNSYLVANIA OIL" and "Supreme Pennsylvania Quality."  Defendant also refers the Court to the case law cited by *Plaintiff* at page 11 of its brief with regard to its false advertising claim under Section 43(a) of the Lanham Act.

In response, Plaintiff submits that obviously its use of these marks and the sales of reproductive antique signs do not constitute a perpetration of a fraud on the public.  Perhaps more importantly, Plaintiff believes that Defendant is essentially challenging the validity of its trademark under Section 2(e)(1) of the Lanham Act,[43] for being primarily geographically deceptively misdescriptive.  According to Plaintiff, such a challenge to a trademark must be made within five years of the registration of the mark pursuant to 15 U.S.C. § 1064(1), which has not occurred.

The Court has previously set forth the elements of a claim for false advertising under the Lanham Act, and Defendant has failed to establish any of the elements of such a claim through either his above cited arguments or evidence.[44]  In addition, to the extent Defendant is challenging the validity of the trademark as being primarily geographically deceptively misdescriptive, such a challenge must fail as more than five years has passed since registration of Plaintiff's trademarks. 15 U.S.C. §§ 1052, 1064.  Having failed to show that Plaintiff committed an unconscionable act immediately related to the equity Plaintiff seeks in respect to this litigation, Defendant has not

---

43. 15 U.S.C. § 1052(e).

44.  The Court notes that the description of the signs as "nostalgic" signifies that they are representative of a period of time dating back many years, and the antique signs submitted as Exhibits 54 and 55 appear to reflect Plaintiff's Pennsylvania heritage at the time.  The Court fails to see how this rises to the level of false advertising to support a defense of unclean hands.

established a defense of unclean hands. Therefore, the Court recommends a finding in favor of Plaintiff on this affirmative defense.

### f. Nominative Fairness of Use

Next, Defendant submits that he and Napierkowski simply used the PENNZOIL signage to tell customers what they did–sold quick oil changes using any one of numerous brands of oil–and through the signage given to them by the numerous manufacturers, including Pennzoil and Shell, informed the customers of what brands of lubricants they sold, and that this amounts to nothing more than nominative fair use. Defendant cites the legal standard for establishing nominative fair use, but fails to show how the evidence here establishes each of these elements.

To establish the defense of nominative fair use, the defendant must prove three things: "(1) that the use of plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service; (2) that the defendant uses only so much of the plaintiff's mark as is necessary to describe plaintiff's product; and (3) that the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services." *Century 21 Real Estate Corp. v. Lendingtree, Inc.,* 425 F.3d 211, 222 (3d Cir. 2005). Although he bears the burden of proving all three of these elements, Defendant in this case has not met his burden with respect to the second and third elements.

As Plaintiff points out in its response, arguably the use of the word "PENNZOIL" in some context is necessary to communicate that a particular oil change facility sells PENNZOIL brand products, if indeed that is true, and therefore arguably, the first element is met here. However, as to the second prong, Defendant has not conclusively established that he used only so much of Plaintiff's mark as is necessary to describe Plaintiff's products. If, as Plaintiff suggests, Defendant

had posted a sign in uniform lettering listing all of the brands of motor oil used, including the PENNZOIL brands, this element would be met. However, Defendant only listed the PENNZOIL brand on the road-side sign which indicated the brands of motor oil featured. Finally, as to the third prong, the evidence of record clearly shows that Defendant's conduct and language does not reflect the true and accurate relationship between Plaintiff's and Defendant's goods or services. Up until several months after this lawsuit was filed, Defendant displayed a large road-side sign stating "We Feature PENNZOIL Products" which incorporated the PENNZOIL logo, and continues to display a five foot wide PENNZOIL logo sign on the side of his building facing oncoming highway traffic, and several other PENNZOIL logo signs in and around his building. Defendant is not an authorized PENNZOIL distributor/dealership, and he uses PENNZOIL lubricants in his oil changes only two to three percent of the time. Yet, the signage displayed by Defendant suggests otherwise. Therefore, Defendant has also failed to establish the third prong of nominative fair use.

Accordingly, the Court finds that Defendant has failed to establish all three prongs of the defense of nominative fair use. Therefore, the Court recommends that summary judgment be granted in Plaintiff's favor on this affirmative defense.

### 3.    Defendant's Motion for Summary Judgment

Defendant asserts that his motion for summary judgment should be granted because no material facts remain in dispute and he is entitled to summary judgment and a dismissal of the complaint because the Plaintiff has failed to produce any evidence which establishes or tends to establish: (1) that any of the signage in question was "spurious counterfeit mark," (2) counterfeiting, (3) dilution, (4) unfair competition, (5) false advertisements, (6) unjust enrichment, (7) that Defendant's conduct was "malicious, fraudulent, deliberate, willful, intentional, and in bad faith, (8)

that Defendant engaged in a deliberate course of conduct to deceive customers, (9) intent, (10) actual confusion, (11) the likelihood of confusion, (12) palming off, (13) the use of bait and switch tactics, (14) actual damages. (Def.'s Mot. for Summ. J. (Doc. 38); Def.'s Mem. (Doc. 39) at 38.) Defendant further asserts that Plaintiff's evidence consists basically of "hyperbol[e] and sophisms by counsel." (Def.'s Mem. (Doc. 39) at 38.) In addition, in his motion for summary judgment Plaintiff asserts several equitable defenses, to wit, that Plaintiff is guilty of abandonment, laches, and acquiescence, and as a consequence of this conduct, Plaintiff has created and/or contributed to confusion or the likelihood of confusion, if any. (Def.'s Mot. for Summ. J.)

Defendant's argument in support of his motion for summary judgment and in opposition to Plaintiff's summary judgment motion consists mainly of bare denials, conclusory statements, and speculative arguments completely lacking in any factual support or foundation. Although Defendant has attached some fifty-five exhibits to his brief, most have not been verified or authenticated and very few have any relevance here.[45] Plaintiff submits that none of these documents, nor the speculative based conclusions Defendant draws from them, create a material issue of fact that would preclude summary judgment against Defendant. Plaintiff specifically argues that none of these submissions rebuts his testimony that: (1) Plaintiff has not authorized Defendant to use PENNZOIL signage; (2) PENNZOIL signage is the most prominent signage at his business; (3) Defendant

---

45. The majority of exhibits in Defendant's appendix comprise his "newly discovered evidence," and include, among other things, advertisements for a window sticker machine and label making machine capable of reproducing the PENNZOIL logo; two catalogs, one offering nostalgic reproductions of tin signs of various oil companies (including PENNZOIL), and the other (Kwik Industries) offering oil change center supplies (including PENNZOIL logoed items); a photograph depicting PENNZOIL sponsorship of NASCAR car/driver; and an article from April 2007 National Oil & Lube News (mostly hearsay) about this lawsuit; and Shell sales promotional materials; and current photographs of his oil change facility (exterior and interior).

displayed a large "We Feature PENNZOIL Products" road-side sign until several months after suit was filed; (4) Defendant ignored Plaintiff's three demand letters as well as a visit from Plaintiff's agent seeking removal of the PENNZOIL signage, beginning shortly after Defendant acquired the business, and Defendant still refuses to remove the remaining PENNZOIL signage; (5) Defendant uses PENNZOIL lubricants in less than 5 % of his oil changes; and (6) several suppliers and about a half dozen customers initially confused Defendant with Plaintiff or Plaintiff's authorized oil change centers. After reviewing Defendant's submissions, the Court agrees with Plaintiff that they do not create a material issue of fact, and indeed, are not relevant or material in the first instance.

The relevant and material, verified evidence submitted by Defendant in this case consists of Defendant's deposition testimony and the photographs and other documents identified therein; Defendant's affidavit and documents attached thereto; Defendant's admissions in his Answer to the complaint; and his admissions to Plaintiff's Statement of Undisputed Facts. As noted above, none of this evidence creates a genuine issue of fact as to any element of Plaintiff's claims for federal trademark infringement, federal unfair competition, common law trademark infringement and unfair competition, and false advertising. To the contrary, Defendant's verified submissions establish that Plaintiff is entitled to judgment as a matter of law on these claims, as discussed at length above in regard to Plaintiff's motion for summary judgment.

In an attempt to overcome Plaintiff's showing of likelihood of confusion for recovery on its claims of federal trademark infringement and unfair competition, and common law trademark infringement and unfair competition, Defendant describes ten different aspects of his oil change business which he claims distinguishes it from Plaintiff's oil change facilities, ranging from business cards and stationary, to uniforms, vehicles, interior work bay, and scope of services provided.

(Def.'s Mem. (Doc. 39) at 8-11.)  However, Defendant misses the mark with these comparisons, as they have no bearing on the issue of the likelihood of confusion involving the unauthorized use of Plaintiff's *trademark*.  Defendant's argument would be more appropriately directed to a claim of trade *dress* infringement,[46] which is not being asserted here.

Another attempt by Defendant to down play the effect of his prominent display of PENNZOIL marks, *i.e.,* which creates a likelihood of confusion, is his submission of undated photographs of various other smaller signs for oil and other products at his oil change facility, which he specifically points out "were taken recently and only reflect the general appearance of Defendant's location after suit."  (Def.'s Mem. (Doc. 39) at 6; Def.'s App. Ex. 2, 5a, 6, 7, 8-12, 26-34.)  These signs have little relevance here as they do not accurately depict, by Defendant's own admission, the actual display of signs at Defendant's business up to and at the time this litigation was instituted.

In summary, Defendant concedes, and the Court finds, that there are no genuine issues of fact as to any of the claims or defenses asserted herein.  However, Defendant has failed to establish that he is entitled to judgment as a matter of law as to Plaintiff's claims of  Federal Trademark Infringement (Count I), Federal Unfair Competition (Count III), Common Law Trademark Infringement and Unfair Competition (Count V), and False Advertising (Count VII).  Defendant has also failed to establish that he is entitled to judgment as a matter of law with respect to all of his

---

46. The term "'[t]rade dress' refers to the design or packaging of a product which serves to identify the product's source.'" *McNeil Nutritionals, L.L.C. v. Heartland Sweeteners, L.L.C.,* 511 F.3d 350, 357 (3d Cir. 2007) (quoting *Shire U.S. Inc. v. Barr Labs. Inc.,* 329 F.3d 348, 353 (3d Cir. 2003)).  "It is 'the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique.'" *Id.* (quoting *Rose Art Indus., Inc. v. Swanson,* 235 F.3d 165, 171 (3d Cir. 2000)).

affirmative defenses. Accordingly, the Court recommends that Defendant's motion for summary judgment be denied as to these claims and defenses.

### 4. **Plaintiff's Request for Injunctive & Monetary Relief**

Plaintiff also requests that the Court award certain injunctive and monetary relief to the extent that the Court has granted summary judgment in its favor on its claims of federal and state trademark infringement, federal and state unfair competition, false advertising, federal trademark counterfeiting, federal and state trademark dilution, and unjust enrichment.

### a. *Permanent Injunction*

Plaintiff has requested a permanent injunction to prevent Defendant from continuing his infringing and counterfeit use of its PENNZOIL mark. Plaintiff contends that failure to issue such injunction will result in further irreparable harm to it and public confusion.

Having recommended that summary judgment be entered in Plaintiff's favor as to its claims of federal trademark infringement and unfair competition, common law trademark infringement and unfair competition under Pennsylvania law, as well as false advertising under the Lanham Act, the Court holds that Plaintiff has proven its entitlement to permanent injunctive relief as to these claims under 15 U.S.C. § 1116. Moreover, in light of Defendant's intentional conduct in continuing to display the infringing sign after learning that he lacked authority to display the PENNZOIL sign, in continuing to display two additional signs bearing the PENNZOIL mark, and his continued and unjustifiable belief that he owns the signs, the Court finds that Plaintiff has and will continue to suffer irreparable harm. *See Times Mirror Magazines,* 212 F.3d at 169 (holding that lack of control

over the use of one's own mark amounts to irreparable harm (citing *Opticians Ass'n v. Indep. Opticians,* 920 F.2d 187, 195 (3d Cir. 1990) ("stating that potential damage to a mark holder's reputation or goodwill or likely confusion between parties' marks constitute irreparable injury for the purpose of granting a preliminary injunction")). Accordingly, the Court recommends that an order be entered:

(1) Permanently enjoining Defendant and Defendant's agents, servants, employees, attorneys, and all those persons in active concert or participation with him, from using the PENNZOIL marks, in commerce, in any manner with regard to his oil change business, Lube Pro;

(2) Directing Defendant to deliver to PQS any and all signage and other advertising or promotional materials in the possession of Defendant or under his control bearing any of the PENNZOIL marks;

(3) Directing Defendant to file with this Court and to serve upon PQS, within thirty (30) days after entry and service on Defendant of a permanent injunction order, a report in writing and under oath setting forth in detail the manner and form in which Defendant has complied with the injunction order.

### b. *Monetary Damages for Trademark Counterfeiting*

Plaintiff has elected to recover statutory damages under 15 U.S.C. § 1117(c) for federal trademark counterfeiting instead of actual damages and profits under 15 U.S.C. §1117(a). However, because the Court has held that Plaintiff has failed to establish a claim for federal trademark

counterfeiting, statutory damages are not available to Plaintiff.[47]  Therefore, the Court recommends that Plaintiff's claim for statutory damages under Section 1117(c) be denied.

### c.        *Reasonable Attorneys Fees and Costs*

Plaintiff has requested reasonable attorneys fees and costs under 15 U.S.C. § 1117(a), which provides for the award of attorneys fees to the prevailing party but only in exceptional cases. Plaintiff submits that this Court should find exceptional circumstances exist here, as Defendant's acts were willfully undertaken in order to mislead consumers and trade off of its goodwill, and Defendant refused to stop using Plaintiff's marks despite repeated demands to stop.  Accordingly, Plaintiff contends it is entitled to reasonable attorney's fees and costs.

Although the term "exceptional" is not defined in the Act, the Court of Appeals has held that a trademark case will be deemed "exceptional" for purposes of awarding reasonable attorneys' fees under the Lanham Act where the infringement is proven to be malicious, fraudulent, deliberate or willful. *Securacomm Consulting, Inc. v. Securacom, Inc.,* 224 F.3d 273, 280 (3d Cir. 2000); *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.,* 952 F.2d 44, 47 (3d Cir. 1991).  In determining what conduct will rise to the level of malicious, fraudulent, deliberate or willful conduct, the Court of Appeals has instructed that "a district court must make a finding of culpable conduct on the part of the losing party, such as bad faith, fraud, malice, or knowing infringement, before a case qualifies as 'exceptional.'" *Ferrero,* 952 F.2d at 47 (citations omitted).  The Court of Appeals further noted that a factor that may be relevant in declining to award attorneys' fees under Section 1117(a) is the plaintiff's failure to show any damages.  *Id.* at 47-48 (citing *Hindu Incense v. Meadows,* 692 F.2d

---

47.  Moreover, recovery of treble damages and reasonable attorneys' fees under 15 U.S.C. § 1117(b), which is predicated on a proven violation of Section 1114(1)(a) involving a counterfeit mark, is likewise unavailable.

1048, 1052 (6th Cir. 1982) (noting that a case is unexceptional for purposes of awarding fees under Section 1117(a) where there has been no loss of sales due to the infringement); *VIP Foods, Inc. v. Vulcan Pet, Inc.,* 675 F.2d 1106, 1107 (10th Cir. 1982) (holding case was unexceptional where there was lack of evidence to establish plaintiff suffered monetary damages and lack of finding by court that defendant intended to deceive or confuse public or willfully infringe plaintiff's trademark)). The *Ferrero* court also cited with approval Judge Pollak's "reasoned exposition of what constitutes an exceptional case" in *Jones Apparel Group, Inc. v. Steinman,* 466 F. Supp. 560, 564 (E.D.Pa. 1979):

> [B]ad faith intentionally must be shown for a case to qualify as exceptional; it must be demonstrated that the "defendant intended to pass off" goods he was selling as those manufactured by the plaintiff, and "[a] strong showing would seem [to be] required to warrant a finding of intentionality."

*Ferrero,* 952 F.2d at 48 (citing *Jones Apparel,* 466 F. Supp. at 564).

Applying these standards to the proven, undisputed facts of this case, the Court concludes that there is sufficient evidence of intentional bad faith to warrant an award of attorneys fees and costs. The facts supporting this finding include Defendant's refusal to take down the sign with Plaintiff's mark after repeated requests to do so, and after being informed that he did not own the sign and was committing violations of the Lanham Act; Defendant had numerous opportunities to avoid this law suit but refused to work out a compromise, even after being apprised that he did not own the signs; Plaintiff was forced to institute the present law suit as a last resort in order to get Defendant to take down the signs displaying the PENNZOIL marks on his oil change facility; Defendant engaged in false advertising under Section 43(a) of the Lanham Act through a "bait-and-switch" operation (*see* discussion *supra* regarding Plaintiff's false advertising claim); and

Defendant's infringement of Plaintiff's marks was intentional (*see* discussion *supra* regarding the fifth *Lapp* factor). Tipping the scale slightly in the direction of unexceptional, are two factors. First, some of the evidence of intentional conduct is circumstantial and/or inferred from Defendant's conduct (*i.e.,* the "switch" part of the "bait-and-switch" operation), thus suggesting that the showing required to warrant a finding of intentionality may not be strong. Second, Plaintiff did not present any proof of actual damages, but opted instead to seek statutory damages, which proved to be unsuccessful in light of the Court's ruling on Plaintiff's trademark counterfeiting claim. However, given that it is often difficult to prove lost sales where, as in this case, there is no probative evidence of actual confusion and Plaintiff's unsuccessful attempt to recover statutory damages, the failure to prove any damages does not weigh very strongly against finding an exceptional case.

Thus, the totality of the evidence weighs in favor of finding bad faith, particularly Defendant's refusal to take down the signs, thereby forcing Plaintiff's hand in bringing this litigation. Therefore, the Court recommends that Plaintiff's request for attorneys' fees and costs be granted. Plaintiff will be directed to submit a fee petition with appropriate itemization/documentation[48] within thirty (30) days of the order entering judgment in its favor.

## III.    CONCLUSION

It is respectfully recommended that Plaintiff's Supplemental Motion for Summary Judgment (Doc. No. 42) be granted as to Count I (Federal Trademark Infringement), Count III (Federal Unfair Competition), Count V (Common Law Trademark Infringement and Unfair Competition), and Count VII (False Advertising), and denied as to Count II (Trademark Counterfeiting), Count IV (Federal

---

48. Plaintiff's fee petition shall be limited to time spent on those claims on which it ultimately prevailed, to the extent such time is segregable.

Trademark Dilution), Count VI (Pennsylvania Trademark Dilution), and Count VIII (Unjust Enrichment). It is further recommended that Defendant's Motion for Summary Judgment (Doc. No. 38) be granted as to Counts II, IV, VI and VIII, and denied as to Counts I, III, V, and VII. It is further recommended that summary judgment be entered in Plaintiff's favor as to all of the affirmative defenses raised by Defendant in his Memorandum of Fact and Law in Support of Defendant's Motion for Summary Judgment (Doc. 39). It is further recommended that Plaintiff's request for a permanent injunction and an award of reasonable attorneys' fees and costs be granted, but Plaintiff's request for statutory damages be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.


Dated:  March 7, 2008    By the Court:

             _____
             LISA PUPO LENIHAN
             United States Magistrate Judge


cc:  The Honorable David Stewart Cercone
   United States District Judge

   All Counsel of Record
   *Via Electronic Mail*